UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MICHELE A. BAPTISTE,

                    Plaintiff,

        -against-

THE CITY UNIVERSITY OF NEW YORK, and
VINCENT BOUDREAU, in his individual and
official capacity,

                  Defendants.
-------------------------------------------------------------X

Docket No: 22-cv-2785

**COMPLAINT**

**JURY TRIAL DEMANDED**

      MICHELE A. BAPTISTE ("Plaintiff" or "Ms. Baptiste"), by her attorneys, JOSEPH & NORINSBERG, LLC., complaining of THE CITY UNIVERSITY OF NEW YORK, (hereinafter "CUNY" or "Defendant CUNY"), and VINCENT BOUDREAU, as President of City College and Individually, (hereinafter "Boudreau" or "Defendant Boudreau"), (collectively hereinafter "Defendants"), alleges upon knowledge as to her own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF CASE

      1.    Plaintiff brings this action to remedy Defendants' illegal retaliation and unlawful discrimination in violation of the: (i) the Equal Benefit Clause of 42 U.S.C. § 1981 ("Section 1981"); (ii) the New York State Human Rights Law ("NYSHRL") and Exec. L. § 296 et seq.: (iii) Title 8 of the Administrative Code of the City of New York, also known as the New York City Human Rights Law ("NYCHRL"); and (iv) any other cause(s) of action that can be inferred from the facts set forth herein.

2.      This is an action for declaratory, injunctive, and equitable relief, as well as for monetary damages, brought by Plaintiff seeking vindication for Defendants' blatant violations of Plaintiff's civil rights pursuant to federal, state, and municipal law protecting the rights of employees in the workplace.

## PRELIMINARY STATEMENT

3.      This case affirms the old adage: "revenge is a dish best served cold." During Plaintiff's tenure as Defendant CUNY's Chief Diversity Officer, Dean of Compliance and Faculty Relations and Title IX Coordinator for the Office of Diversity & Compliance at City College, she concluded, after a lengthy investigation, that Defendant Boudreau had unlawfully retaliated against the Flom professor of Legal studies, Dr. Lynda G. Dodd ("Dr. Dodd").

4.      Specifically, Ms. Baptiste found that Boudreau had sanctioned the termination of Dr. Dodd, a disabled faculty member who had been diagnosed with multiple sclerosis ("MS"), after she had requested a reasonable accommodation for her disability and had complained that her request had gone unanswered.

5.      After issuing the negative finding regarding Boudreau's unlawful behavior, Plaintiff drafted a letter of reprimand against Boudreau, and in doing so, created a permanent record of his illegal conduct.  Further, Boudreau was verbally counseled and admonished for his unlawful conduct by then President of CUNY, Lynda Coico, ("Coico) in the presence of Ms. Baptiste, and others, and the letter of reprimand was handed to Boudreau during said meeting.

6.      Boudreau did not assume any responsibility for his unlawful conduct. Rather, he perceived himself as above the law, and despite having just been reprimanded and humiliated for illegally retaliating against Dr. Dodd, without an ounce of remorse, Boudreau expressed his desire to have Plaintiff terminated for ensuring that he was held accountable for his unlawful actions.

However, at the time, Boudreau, as Dean of The Colin Powell School, lacked the authority to have Ms. Baptiste terminated.

7.      Fortunately for Boudreau, approximately seventeen months later, CUNY -- despite Boudreau's apparent commitment to engaging in illegal acts of retaliation -- inexplicably, increased Boudreau's authority and made him interim President of City College, after Coico tendered her resignation.

8.      As interim President, Boudreau, for the first time, had supervisory authority over Plaintiff. Boudreau immediately thereafter, executed a steady and highly effective campaign of retaliation against Plaintiff, where he methodically stripped Plaintiff of allies and resources to cripple her overall effectiveness in her position.

9.      Despite Boudreau's repeated, related, and unremedied acts of retaliation against Plaintiff, Ms. Baptiste remained steadfast in her commitment to creating a more diverse and equitable place for Defendant CUNY's students, faculty and employees.  Consequently, in early 2018, when Boudreau, expressed his desire to retaliate against another CUNY employee -- who had complained to the EEOC about being subjected to a hostile work environment, where he was called the N-Word and Faggot -- Plaintiff rightfully and bravely objected.

10.     Almost immediately after Ms. Baptiste engaged in protected activity and objected to Boudreau's desire to, yet again, retaliate against an employee for complaining of discrimination Boudreau, executed his long-held desire to terminate Plaintiff's employment.

11.     Indeed, unlike years prior, Boudreau, now well entrenched in his position as President, Boudreau not only used his authority to terminate Plaintiff, but he elected to do so in a manner that caused Plaintiff great humiliation and created the false impression that she had engaged in misconduct, very much like how Boudreau was made to feel after Plaintiff's negative

findings against him. The difference being, that Boudreau had actually engaged in misconduct, while the Plaintiff, through her bravery and commitment to protecting the civil rights of CUNY's employees, had done nothing wrong.

12.     As set forth in more detail below, Defendants intentionally violated Plaintiff's civil rights under municipal, state and federal law, and as such must be held accountable.

## JURISDICTION AND VENUE

13.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. § 1981 and 29 U.S.C. § 201, *et seq*. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all state and municipal law claims.

14.     The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Plaintiff filed a timely charge of discrimination with the New York State Division of Human Rights ("NYSDHR") which in effect tolled her city and state claims.

16.     On or about February 24, 2022, Plaintiff requested a dismissal for administrative convenience from the Division to pursue her municipal, state and federal claims in the same forum. On or about March 14, 2022 the NYSDHR granted Plaintiff's request for dismissal for administrative convenience.

17.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(ii), as all actions comprising the claims for relief occurred within this judicial district, and pursuant to 28 U.S.C. § 1391(b)(i), as one or more of the Defendants reside and regularly do business within this judicial district.

**JURY DEMAND**

18.    Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

**PARTIES**

19.    At all relevant times hereinafter mentioned, Plaintiff MICHELE A. BAPTISTE, is a Black female, and a resident of the State of New York, residing in the County of Nassau.

20.    At all times relevant herein, Plaintiff was and is a "person" and an "employee" within the meaning of the NYSHRL and NYCHRL, and was acting within the scope of her employment with CUNY.

21.    Defendant CUNY is a publicly-funded university system, comprised of senior and community colleges, graduate and professional schools research centers, institutes and consortia. Its headquarters and principal place of business is 217 E. 42nd St, New York, New York 10017. One of the senior colleges within CUNY is City College of New York ("CCNY"). Upon information and belief, CUNY receives federal financial assistance.

22.    At all times relevant herein, Defendant CUNY is an "employer" within the meaning of the NYSHRL and NYCHRL, and employed four or more "employees" within the meaning of the NYSHRL and NYCHRL.

23.    At all times relevant herein, Plaintiff was employed as Chief Diversity Officer, Dean of Faculty Relations, Compliance, Title IX Coordinator and ADA/504 Coordinator at CCNY, which is part of Defendant CUNY.

24.    At all times relevant herein, Defendant Boudreau was the President of the CCNY.

25.    As President, Boudreau was Plaintiff's supervisor and therefore he was and is an "employer" within the meaning of the NYSHRL and NYCHRL, and employed four or more "employees" within the meaning of the NYSHRL and NYCHRL.

## BACKGROUND FACTS

26.     Defendant CUNY hired Plaintiff in June of 2013, as Chief Diversity Officer, Dean of Faculty Relations, Compliance, Title IX Coordinator and ADA/504 Coordinator.

27.     When Defendant CUNY first hired Plaintiff, she reported to then President of City College, Dr. Lisa Coico, and Plaintiff was a member of the President's cabinet.

28.     At the time of Plaintiff's hire, the Office of Diversity and Inclusion was staffed with a full-time Affirmative Action Specialist, Steven Gonzalez, a full-time EEO Investigator, Nancy Berger Affirmative Action Specialist and a part-time student employee, all of whom were part of Plaintiff's team.

29.     As Dean of the Office of Diversity and Inclusion, Plaintiff's responsibilities included investigating complaints filed under CUNY's Nondiscrimination and Sexual Misconduct Policies, as well as monitoring job searches to ensure compliance with affirmative action laws, diversity goals and university policies.

30.     Further, as Defendant CUNY's ADA/504 Coordinator, Plaintiff served as the appellate review for employees who filed reasonable accommodation requests.

**Plaintiff Issued an Adverse Finding Against Defendant Boudreau for Illegally Retaliating Against a Faculty Member who had Complained of Boudreau's Illegal Disability Discrimination and Retaliation.**

31.     In early 2010, the Flom Professor of legal studies for the Skadden Arps Honors Program, Dr. Lynda Dodd was diagnosed with multiple sclerosis ("MS"). Dr. Dodd's initial symptoms included facial spasms and difficulty climbing stairs. By the summer of 2011, an MRI confirmed demyelination in her cervical spine, which is damage to the protective covering of the nerves. Subsequently, Dr. Dodd contracted a series of viral infections that caused her to lose her voice and cough incessantly.

32.     By late 2012/early 2013, Dr. Dodd's MS worsened and included declining mobility, extreme fatigue, and a severe form of pain called "dysesthetic extremity pain." By January of 2014, Dr. Dodd's neurologist advised her that her tests were consistent with primary progressive MS, the more severe form of the disease.

33.     From May 2013, through September 2014, Dr. Dodd had multiple discussions with HR regarding reasonable accommodations she would need to navigate around her worsening physical limitations as a result of her MS.

34.     During Dr. Dodd's tenure with Defendant CUNY, Dr. Dodd had been initially appointed for a one-year term and then considered for reappointment for successive one-year terms. Moreover, the upcoming school year would be particularly demanding, since Dr. Dodd would also be up for tenure consideration and had to complete the required research and publications, to be considered for tenure. It was therefore imperative that Dr. Dodd seek a reasonable accommodation from her immediate supervisor to complete her research in light of her MS.

35.     During the onset and escalation of Dr. Dodd's MS, Dr. Bruce Cronin ("Dr. Cronin") became the Chair of the Political Science Department, and as such her immediate supervisor. Further by January of 2014, Defendant Boudreau had assumed the position of Dean, of the then newly-established Powell School.  Since the Political Science Department, was part of the Powell School, Boudreau became Cronin's immediate supervisor.

36.     On September 4, 2014, Dr. Dodd met with Dr. Cronin and requested an accommodation to give her more time to conduct the research and publications expected for tenure. Dr. Cronin denied Dr. Dodd's request, without even attempting to engage in the interactive process.   Dr. Dodd, then objected to Dr. Cronin's blatant refusal to entertain her request for an

accommodation, by repeatedly expressing her need for the accommodation in light of her declining health.

37.     On or about September 16, 2014, Dr. Cronin, with Boudreau's blessing, escalated his unlawful conduct and sent Dr. Dodd an email stating that the department, for the first time, would be voting against renewing her reappointment for the 2015-2016 academic school year, and would be removing her from tenure track.

38.     Dr. Dodd, in response, immediately met with Ms. Baptiste to discuss how to appeal Dr. Cronin and Boudreau's decision. Subsequently, Dr. Dodd requested an accommodation to extend the time on her tenure clock.

39.     In December of 2014, after speaking with Cronin, Baptiste denied Dr. Dodd's request for an accommodation.   In making her decision, Baptiste relied primarily on Dr. Cronin's representation that Dr. Dodd had waited until *after* receiving a non-reappointment letter from the Political Science Department, before making the request for an accommodation.

40.     On January 28, 2015, Dr. Dodd formally appealed the decision to deny her request for an accommodation directly to Coico, by alleging that Dr. Cronin had discriminated against her based on her disability by refusing to grant her request for an accommodation.  Dr. Dodd further alleged that she had made the accommodation request to Dr. Cronin, *before* she received his email that she would not be reappointed for the upcoming school year and removed from tenure track.

41.     In support of her claim, Dr. Dodd produced a recorded conversation between herself and Dr. Cronin that proved that she had, in fact, raised her request for an accommodation, on September 4, 2014, *before* she had received notice that she would not be reappointed for the upcoming school year and would be removed from tenure track.

42.     In that recording, Dr. Dodd is heard repeatedly requesting an accommodation and Dr. Cronin, without even attempting to engage in the interactive process, denies her request.

43.     Dr. Cronin in response to Plaintiff confronting him with the recording, became visibly angry and essentially informed Plaintiff he wanted nothing to do with Dr. Dodd, for recording him.

44.     Moreover, while Dr. Dodd's appeal was pending, and as compelling evidence of Boudreau's policy and practice to discriminate, indicative of his vindictive and petty nature, Boudreau removed favorable remarks about Dr. Dodd by a student, by changing a quote that had originally praised "Professor Dodd's class" to instead praising, "My Skadden class."

45.     On or about March 5, 2015, upon learning of Dr. Cronin's outright misrepresentation, and more so, because of Plaintiff's recommendation, then President Coico granted Dr. Dodd's appeal, ceased all efforts by Dr. Cronin and Boudreau to have Dr. Dodd terminated, reappointed Dr. Dodd for the upcoming 2015-2016 school year and reinstated Dr. Dodd's eligibility for tenure.

46.     Remarkably, Dr. Cronin, a mere two days after Dr. Dodd had won her appeal, and with the full support of Defendants' discriminatory policy and practice implemented through Boudreau, swiftly retaliated against Dr. Dodd by changing her teaching schedule to a more demanding schedule that required her to essentially double her in class time.  Dr. Cronin and Boudreau's retaliation was particularly spiteful, considering both men knew of Dr. Dodd's MS and the painful physical limitations she was forced to contend with, as she continued working despite her MS.

47.    On March 25, 2015, Dr. Dodd filed a formal Complaint with Baptiste, alleging that Dr. Cronin and Defendant Boudreau had discriminated against her based on her disability, and then subsequently retaliated against her in response to her appealing CUNY's decision to have her terminated directly to Coico.

48.    On or about June 29, 2015, Ms. Baptiste issued findings on Dr. Dodd's discrimination and retaliation complaints. Plaintiff found that Dr. Cronin had discriminated and retaliated against Dr. Dodd in denying her request for a reasonable accommodation.

49.    Further, Plaintiff determined that Boudreau, who at all times supervised Dr. Cronin in his handling of Dr. Dodd, had knowledge of Dr. Cronin's unlawful actions and misrepresentations yet condoned it, and in doing so, was complicit in the retaliation against Dr. Dodd. Indeed, Plaintiff's findings read in part "***that Defendant Boudreau's failure to supervise Cronin …. constituted retaliation.***"

50.    Thereafter, Plaintiff recommended to Coico that Dr. Cronin be removed as Chair of the Political Science Department and that a letter of reprimand be placed in Defendant Boudreau's personnel file.  Plaintiff further recommended that the Skadden Arps program be removed from the Political Science Department and/or Colin Powell school, where both Cronin and Boudreau held leaderships roles.

51.    Coico implemented some of Plaintiff's recommendations.

52.    Coico had Plaintiff draft a letter of reprimand that summarized Boudreau's misconduct and unlawful acts of retaliation against Dr. Dodd.

53.    Coico then met with Boudreau and verbally counseled him, in front of Ms. Baptiste, based on the letter Plaintiff had written.

54.     Upon information and belief, Coico had the letter of reprimand permanently placed in Boudreau's personnel file.

55.     In short, as a result of Plaintiff's negative findings and recommendation, Boudreau, was subjected to a humiliating counseling session from his superior and his personnel file, as per CUNY's internal policies, would now contain a permanent summary of his unlawful behavior.

56.     Further, as a result of Plaintiff's negative findings and recommendations, Dr. Cronin and Boudreau's nearly successful efforts to illegally terminate Dr. Dodd, were completely derailed.

**Despite Boudreau's Track Record of Engaging in Unlawful Acts of Retaliation, CUNY Appoints Boudreau as Interim President and Enables Boudreau to Immediately Retaliate Against Plaintiff After his Appointment.**

57.     In or around October of 2016, which was approximately seventeen months after Plaintiff had issued her negative finding against Boudreau, Coico resigned as the President of CCNY.

58.     Shockingly, in or about November of 2016, Defendant CUNY appointed Boudreau as interim President, as CUNY continued to conducted a search to find a permanent replacement.

59.     After being appointed interim President, Boudreau, formally entrenched his repeated instances of discriminatory practices into CUNY policy and overtly expressed that he wanted Plaintiff terminated.

60.     Specifically, Boudreau shared with members of his inner professional circle that he had a list of people he wanted to terminate, and that Plaintiff was on the list.

61.     Nonetheless, Boudreau knew that immediately terminating Plaintiff, who had an exemplary performance history to date, would have appeared as a blatant act of retaliation and compromised his chances of being permanently installed as President.   Additionally, Boudreau had already terminated two African American women in the roles of the Vice President of

Communications and Vice President of Student Affairs and was receiving criticism from the Harlem political community.

62.     Specifically, influential and politically active members of the Harlem community had expressed outrage that Boudreau, who had not been on the short list of qualified candidates proposed by the selection committee, had been selected as interim President.

63.      Consequently, Boudreau exercised restraint, and ascribed to the old adage, "keep your friends close and your enemies closer."

64.     Rather than immediately terminate Plaintiff, which would have likely drawn unwanted scrutiny, formal complaints and possibly a civil lawsuit, Boudreau engaged in pattern of retaliatory behavior against Plaintiff, consistent with his past practices of discrimination and retaliation, designed to remove her allies and support network, limit her access to him as she would now report directly to him, and significantly reduce her resources, to decrease her overall effectiveness and influence at CUNY.

65.     First and foremost, within days of Boudreau's appointment, he disbanded, former President Coico's Council on Inclusiveness Excellence ("the Council").

66.      The Council had been responsible for the creation of Plaintiff's role.

67.     By way of background, former President Coico had created the Council to address the recruitment and retention of people of color, as well as improve their overall experience at CUNY.

68.     After considerable research, the Council recommended hiring a Chief Diversity officer at the level of Dean to meet Coico's all important objective of establishing the importance of diversity at City College.

69.     After a lengthy nationwide search, Ms. Baptiste was hired.

70.     And throughout Plaintiff's tenure, Plaintiff, and at times with the assistance of the Council, had advocated for women, the disabled, and racial minorities in instances where the college had failed to hire, retain or promote individuals in these protected categories.

71.     By dismantling the Council, Boudreau effectively eliminated the group that had determined there was a need for a Chief Diversity Officer of Inclusion, and who had been vested in her success.    Moreover, by dismantling the Council, Boudreau greatly diminished Plaintiff's key allies in helping Plaintiff eradicate racial and gender disparities at City College in relation to hiring, retention and termination.

72.     Of note, the Council on Inclusive Excellence was the first and only committee Boudreau disbanded, as soon as he became interim President.

73.     Next, as a further related example of his discriminatory practices, Boudreau, significantly reduced all contact with the Plaintiff, in comparison to that of his predecessor. Boudreau would only meet with her for their monthly meetings and all communications had to go through his assistant.  By limiting communication with the Plaintiff, Boudreau was able to slow down and hamper Plaintiff's ability to act on complaints, since she at all times needed his input to move forward on her investigations.

74.     Finally,  and  of  most  significance,  Boudreau  intentionally  kept  Plaintiff's department  woefully  understaffed  and  underfunded,  demonstrating  a  policy  designed  to discriminate  and  retaliate.    As  noted  above,  when  Plaintiff  first  assumed  her  role,  she  had approximately four individuals on her team.

75.     During Boudreau's interim appointment, Plaintiff's staff was only comprised of two part time employees. Further, to add insult to injury, Boudreau then reduced the schedule of the part-time investigator, Ms. Lawanda Israel ("Israel"), from two days a week, to one.

76.     Consequently, as the need for CUNY to aggressively investigate Title IX claims increased, especially in the wake the of the MeToo movement, Boudreau ensured that Plaintiff would have even less resources.

77.     Boudreau would have been content to keep Plaintiff in this professional purgatory and conveniently under his thumb, had things remained status quo. However, in December of 2017, Dodd filed a federal complaint in which CUNY, Boudreau, as well as others, were named Defendants.

78.     As a result of Dodd's federal lawsuit, Boudreau would now be forced to relive a humiliating chapter in his career for an indefinite period of time.

79.     Moreover, as a result of the lawsuit, Boudreau would now be forced to defend himself against allegations that he had illegally discriminated and retaliated against Dodd.

80.     Further, Dodd's allegations against him were significantly strengthened by Plaintiff's negative finding against him and the disciplinary letter that the Plaintiff drafted which as per Defendant CUNY policies, should be contained in his personnel file.

81.     Even after being named as a Defendant in a federal lawsuit in December 2017 and with knowledge of Boudreau's prior act of retaliation, CUNY allowed Boudreau to continue make decisions about Dr. Dodd's employment.  As a result, Boudreau made the decision to terminate Dr. Dodd's employment in or about April 2018.

**Defendants Terminate Plaintiff in Retaliation for Opposing Defendants' Intention to Retaliate Against a Black Employee Who Had Been Called the N-Word by Co-Workers**.

82.     After Dr. Dodd filed her lawsuit naming Boudreau as a defendant, directly linked to his past history of discrimination and retaliation, interactions between Boudreau and Plaintiff grew even more tense.  In fact, Boudreau ceased scheduling their monthly one on one meetings

and when Plaintiff's inquired with his office, she was advised that he would let Plaintiff know when it was back on the calendar.

83.    To make matters worse, in or around that time, Defendants were also responding to complaints of racial and sexual orientation discrimination from CUNY's employee, Curtis Rias ("Rias").

84.    Rias is of African American and Hispanic descent, and by the fall of 2017, had been working for CUNY as an Information Technology professional for approximately 26 years.

85.    In around 2015, Rias was reassigned from City College's Information Technology department, to its Office of Public Safety ("Public Safety").

86.    While working in public safety, Rias alleged that he was subjected to a hostile work environment where his co-workers repeatedly used racist and homophobic tropes, in Rias' presence, such as the N-word and "Faggot," as well as other deplorable and toxic terms.

87.    Despite making several complaints to Defendant CUNY, Rias' co-workers were allowed continue their unlawful conduct with impunity.

88.    Consequently, on or about January 13, 2018, Rias filed a Charge of discrimination with the EEOC against CUNY, alleging that he had been subjected to a hostile work environment.

89.    Boudreau became enraged after learning of Rias' EEOC Charge. Unfortunately, Boudreau's anger was not directed at Rias' co-workers for expressing racist and homophobic sentiments; Rather, Boudreau's anger was directed at Rias for making the complaint.

90.    Not surprisingly, after Rias filed his EEOC Charge, Defendants performed  no meaningful investigation – sending the message that Boudreau's own discriminatory and retaliatory practices were indeed adopted and approved by CUNY and that as a result, they would

turn a blind eye to the racist and homophobic conduct. Rias was then subjected to further harassment and repeated acts of retaliation.

91.    Over time, and as a direct consequence of Defendants' failure to take corrective action, Rias suffered from severe work-related stress, which caused Rias to experience a medical emergency at work.

92.    Consequently, in or around early 2018, Rias requested a reasonable accommodation with respect to his work environment.

93.    As with Dodd, Plaintiff would be making a recommendation to CUNY, and more specifically CUNY's President Boudreau, concerning whether Rias' request should be granted. Consistent with Defendants' practices and policy of discrimination, Boudreau would once again attempt to thwart the same.

94.    Shortly after Rias requested his medical accommodation, Boudreau summoned the Plaintiff to a meeting with other employees, where the sole purpose was to discuss what action should be taken against Rias and his request for a medical accommodation. Rather than focusing on Rias' accommodation request, the discussion focused on behavior that appeared retaliatory such as starting to conduct performance evaluations of Rias, even though he had worked almost two decades without almost any mandatory performance evaluations.

95.    During this meeting, Boudreau, apparently feeling untouchable, expressed anger towards Rias for filing his discrimination complaints.  Boudreau expressed that he wanted to deny Rias' request for a medical accommodation and seek retribution against Rias by making his work environment even more uncomfortable.

96.     As Plaintiff listened to Boudreau express his anger, she was particularly frustrated, as a Black individual, and as one who championed equal rights in the work place, that her employer was willing to allow rampant use of the N-Word and Faggot to essentially go unpunished. Moreover, Plaintiff was disgusted, but not the least bit surprised, by Boudreau's unlawful and highly inappropriate anger at Rias for complaining about being subjected to one of the most painful words in the Black community.

97.     And although it would have been very convenient, given her already tenuous work relationship with Boudreau, to simply "play along," Plaintiff made it clear during the meeting that her recommendation would be guided by objectively examining whether Rias was legally entitled to his accommodation request.

98.     After this meeting, Boudreau stopped conducting one-one meetings with Plaintiff, ceased nearly all direct communications with the Plaintiff and rarely if ever responded to her emails.

99.     In the following weeks, Plaintiff reviewed Rias' request for a medical accommodation, and determined that not only should it be granted, but that it would be unlawful to refuse to grant his accommodation because he had filed a complaint of discrimination against Defendant CUNY.

100.    On or about April 25, 2018, during a meeting attended by Plaintiff, Boudreau, and other key personnel, Plaintiff informed Boudreau that Rias' request for an accommodation should be granted because CUNY had a legal obligation to do so.  Plaintiff further advised that denying Rias' request for an accommodation because he had filed a complaint of racial discrimination, as well as other claims, would be an act of illegal retaliation.

101.    Ironically, on or around April 26, 2018, mere days after and directly related to Plaintiff plainly objected to Defendants' desire to unlawfully retaliate against a person of color who had legitimate complaints of discrimination against Defendant CUNY, Defendants unlawfully retaliated against the Plaintiff by terminating her employment, for voicing her objections.

102.    On April 26, 2018, within mere days of Plaintiff engaging in protected activity, Boudreau walked into Ms. Baptiste's office without any prior notice and announced her termination.

103.    While the meeting with Boudreau lasted approximately 5 minutes, it was actually the longest interaction that the Plaintiff had with her former supervisor who had unilaterally cancelled their monthly meetings since December 2017.

104.    During said termination meeting, Boudreau informed Plaintiff that he had decided to implement a "Change in Administration" and that HR would speak further to the Plaintiff.

105.    After meeting briefly with HR, who simply reiterated that Defendants were terminating her, Defendants gave Plaintiff approximately fifteen minutes to clean out her desk, while campus security waited outside her office, to escort her from the building.

106.    The manner in which Defendants terminated Plaintiff was inconsistent with someone of her stature who had never been accused of any misconduct or wrongdoing. Boudreau specifically terminated Plaintiff in this manner as an act of unlawful retaliation, out of spite, to humiliate her, and create the false impression that she had engaged in some sort of misconduct, which has created a blemish on the Plaintiff's employment record and impeded her ability to gain future employment in higher education.

107.    Defendants terminated Plaintiff in retaliation for her opposition to participate in discriminatory and retaliatory conduct against Rias, and directly because of and related to Defendants' now longstanding unremedied practice and policy to discriminate and retaliate.

**Defendants Advance Pretextual and Shifting Explanations for Plaintiff's termination, which is Further Evidence of Defendants' Retaliatory Motives.**

108.    As noted above, Boudreau informed Plaintiff on the day of her termination that she was being terminated because of a "Change in Administration."

109.    Several hours later, Boudreau announced at a union meeting that Plaintiff had been terminated due to "financial reasons" and stated that he would be downgrading the Plaintiff's former position when the search for a replacement was conducted.

110.    Several weeks later, at another administrative meeting, Boudreau, shifted his reasons for terminating Plaintiff from "financial" to for the first time, alleging that Plaintiff had been terminated for "performance issues."

111.    It is CUNY's policy to engage in progressive discipline such as verbal warnings, counseling memos and disciplinary write-ups when an employee's performance has not met expectations.

112.    In the case of Plaintiff, Defendants conducted no verbal counseling and issued no counseling memos or disciplinary write ups at any point during her tenure.

113.    No documentation exists showing that Defendants had cited Plaintiff for and provided her written notice of any performance issues at any point during her tenure.

114.    The first time Plaintiff even learned of these contrived "performance issues" was nearly a year after her termination, when Defendants included these manufactured issues in their response to the investigation by the New York State Division of Human Rights.

115.    Of note, after terminating Plaintiff, Boudreau, initially named Jennifer Light, a Caucasian women as interim Chief Diversity Officer and Title IX Coordinator for the Office of Diversity and Compliance.

116.    Light had absolutely no prior experience in Diversity and Inclusion, and openly admitted as much to her colleagues. In order to address Light's deficiencies, Boudreau proposed, for the first time, increasing the resources of the Office of Diversity and offered additional work hours to the Diversity Investigator, Israel.

117.    Light's complete lack of experience, and the haphazard manner in which Boudreau selected Light for such an inappropriate role, further establishes that Boudreau's termination of Plaintiff was not based on performance issues, but an emotional reaction to Plaintiff objecting to discriminating against Rias and Boudreau's long held animosity towards Plaintiff for her negative finding against him on Dodd.

**Boudreau Also Illegally Terminated Plaintiff Because he had No Desire to Have a Person of Color as Chief Diversity Officer.**

118.    After Light's last-minute appointment, Defendant CUNY created a search committee to find a qualified candidate to permanently fill the role of Chief Diversity Officer and Title IX Coordinator for the Office of Diversity and Compliance.

119.    Upon information and belief, the search Committee presented approximately three qualified candidates, all of whom were individuals of color with formal experience in D&I, to fill the role of Chief Diversity Officer and Title IX Coordinator for the Office of Diversity& Compliance.

120.    Defendant Boudreau rejected all of them.

121.    Rather, he appointed Diana Cuzzo, a Caucasian woman and former District Attorney with no formal experience in Diversity & Inclusion.

122.    Boudreau's willingness to ignore the Committee, and seek out a Caucasian individual with no formal experience in D&I, further confirms his desire not to have a person of color in the role and represents another related example within his longstanding policy and practice to discriminate.

123.    Moreover, it establishes that Plaintiff's race also played a role in his desire to terminate her employment.

**After terminating Plaintiff, Defendants Immediately Allocate More Resources to the Office of Diversity & Compliance.**

124.    Despite citing financial reasons for terminating Plaintiff, Boudreau, for the first time since being appointed President, allocated more resources to the department of Diversity & Inclusion, which is further evidence that he had intentionally kept the department underfunded during Plaintiff's tenure.   Moreover, this decision further confirms that his initial claim that Plaintiff had been terminated for financial reasons was completely fabricated.

125.    In fact, and as noted above, Boudreau even authorized increasing the hours of investigator Israel to provide Plaintiff's former department with more resources.

126.    As a direct consequence of the Defendants' conduct described above, the Plaintiff has suffered and continues to suffer significant emotional and economic damages that are ongoing.

**FIRST CLAIM AGAINST DEFENDANTS**
***(Racial Discrimination and Retaliation in Violation of 42 U.S.C. § 1981)***

127.    Plaintiff repeats, reiterates, and realleges each allegation set forth above with the same force and effect as if more fully set forth herein.

128.    42 U.S.C. § 1981 prohibits discrimination in the terms, conditions, and privileges of employment because of an individual's race.

129.    Defendants, as described above, discriminated against Plaintiff in violation of the 42 U.S.C. § 1981 by making material decisions regarding Plaintiff's employment such as: (i) disbanding the Council on Inclusive Excellence which had been created in part to remedy Defendant CUNY's systemic discriminatory practices with respect to the hiring, retention and promotion of individuals of color: (ii) treating non-Caucasian employees less favorably, and allowing said employees to be subjected to a hostile work environment where the N-Word was used with impunity; (iii) retaliating against said employees for lodging complaints of discrimination against Defendants; and (iv) terminating Plaintiff's employment in part because of her race and replacing her position with lesser qualified Caucasian employees.

130.    Defendants, as described above, subjected Plaintiff and others to a continuous practice and policy of discrimination, by carrying out a series of related and unremedied discriminatory acts over multiple years, culminating in terminating Plaintiff's employment.

131.    As a direct and proximate result of Defendants' discriminatory conduct and unlawful retaliation in violation of 42 U.S.C. § 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

132.    As a direct and proximate result of Defendants' discriminatory conduct and unlawful retaliation in violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## SECOND CLAIM AGAINST DEFENDANTS
### *(Racial Discrimination and Harassment in Violation of the NYSHRL)*

133.    Plaintiff repeats, reiterates, and realleges every allegation set forth above with the same force and effect as if more fully set forth herein.

134.    The NYSHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's race.

135.    Defendants, as described above, discriminated against Plaintiff in violation of the NYSHRL by permitting a racial discrimination during Plaintiff's employment.

136.    Defendants, as described above, subjected Plaintiff and others to a continuous practice and policy of discrimination, by carrying out a series of related and unremedied discriminatory acts over multiple years, culminating in terminating Plaintiff's employment.

137.    By engaging in the foregoing conduct, Defendants have violated Plaintiff's rights under the New York State Human Rights Law, in that Plaintiff was disparately treated based on racial affiliation.

138.    Defendants acted intentionally with malice or with reckless disregard for Plaintiff's rights, proximately causing Plaintiff mental anguish, pain and suffering, emotional distress, severe mental anguish, and the loss of income and other related benefits, thereby entitling Plaintiff to an award of monetary damages and other relief.

## THIRD CLAIM AGAINST DEFENDANTS
### *(Retaliation in Violation of the NYSHRL)*

139.    Plaintiff repeats, reiterates, and realleges every allegation set forth above with the same force and effect as if more fully set forth herein.

140.    The NYSHRL prohibits retaliation by any person against any individual who in good faith complains about discriminatory practices to which he/she has been subjected.

141.    Plaintiff is an "employee" within the meaning of the NYSHRL, while Defendants are "employers" under the NYSHRL

142.    As described above, the Defendants retaliated against Plaintiff in violation of the NYSHRL when Plaintiff, in good faith, voiced her opposition to Defendants' unlawful labor practices and discriminatory practices based on race and disability.

143.    Defendants, as described above, subjected Plaintiff and others to a continuous practice and policy of retaliation, by carrying out a series of related and unremedied retaliatory acts over multiple years, culminating in terminating Plaintiff's employment.

144.    By engaging in the foregoing conduct, Defendants have violated Plaintiff's rights under the New York State Human Rights Law in that Plaintiff was retaliated against for opposing Defendants' discriminatory practices.

145.    Defendants acted intentionally, with malice or with reckless disregard for Plaintiff's rights, proximately causing plaintiff mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling Plaintiff to an award of monetary damages and other relief.

## FOURTH CLAIM AGAINST DEFENDANTS
### (Racial Discrimination and Harassment in Violation of the NYCHRL)

146.    Plaintiff repeats, reiterates, and re-alleges every allegation set forth above with the same force and effect as if more fully set forth herein.

147.    The NYCHRL prohibits discrimination in the terms, conditions, and privileges of employment based on an individual's race.

148.    Defendants, as described above, discriminated against Plaintiff in violation of the NYCHRL by permitting a racial discrimination during Plaintiff's employment.

149.    Defendants, as described above, subjected Plaintiff and others to a continuous practice and policy of discrimination, by carrying out a series of related and unremedied discriminatory acts over multiple years, culminating in terminating Plaintiff's employment.

150.    By engaging in the foregoing conduct, Defendants have violated Plaintiff's rights under the New York City Human Rights Law, in that Plaintiff was disparately treated based on racial affiliation.

151.    Defendants acted intentionally with malice or with reckless disregard for Plaintiff's rights, proximately causing Plaintiff mental anguish, pain and suffering, emotional distress, severe mental anguish, and the loss of income and other related benefits, thereby entitling Plaintiff to an award of monetary damages and other relief.

## FIFTH CLAIM AGAINST DEFENDANTS
### *(Retaliation in Violation of the NYCHRL)*

152.    Plaintiff repeats, reiterates, and realleges every allegation set forth above with the same force and effect as if more fully set forth herein.

153.    The NYCHRL prohibits retaliation by any person against any individual who in good faith complains about discriminatory practices to which he/she has been subjected.

154.    Plaintiff is an "employee" within the meaning of the NYCHRL, while Defendants are "employers" under the NYCHRL.

155.    As described above, the Defendants retaliated against Plaintiff in violation of the NYCHRL when Plaintiff, in good faith, voiced her opposition to Defendants' unlawful labor practices and discriminatory practices based on race and disability.

156.    Defendants, as described above, subjected Plaintiff and others to a continuous practice and policy of retaliation, by carrying out a series of related and unremedied retaliatory acts over multiple years, culminating in terminating Plaintiff's employment.

157.    By engaging in the foregoing conduct, Defendants have violated Plaintiff's rights under the New York City Human Rights Law, in that Plaintiff was retaliated against for opposing discriminatory practices by Defendants.

158.    Defendants acted intentionally, with malice or with reckless disregard for Plaintiff's rights, proximately causing Plaintiff mental anguish, pain and suffering, emotional distress, and the loss of income and other related benefits, thereby entitling plaintiff to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.    Preliminary and permanent injunctions against the Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

b.    A judgment declaring that the practices complained of herein are unlawful and in violation of the United States, New York State and New York City laws.

c.    An order restraining Defendants from any retaliation against Plaintiff for participation in any form in this litigation;

d.    A finding that Defendants committed a continuing violation of the United States, New York State, and New York City laws described herein, such that Plaintiff's statute of limitations period is delayed until the last discriminatory act in furtherance of Defendants' violations thereof;

e.    Damages which Plaintiff has sustained as a result of the Defendants' conduct, including back pay, front pay, general and special damages for lost compensation and employee

benefits that he would have received but for Defendants' conduct, for out-of-pocket losses that Plaintiff has incurred due to the Defendants' conduct;

f.      An award for all non-monetary and/or compensatory damages, including but not limited to, compensation for severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

g.      An award of damages in an amount to be determined at trial to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

h.      Punitive damages to the extent authorized by law in an amount commensurate with Defendants' ability and to deter future unlawful conduct;

i.      Awarding Plaintiff costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

j.      Pre-judgment and post-judgment interest, as provided by law; and

k.      Granting Plaintiff other and further relief as this Court finds necessary and proper.

Dated: New York, New York
       April 4, 2022

                          Respectfully Submitted,

                          JOSEPH & NORINSBERG, LLC.


                   By:    _____
                          Bennitta L. Joseph, Esq.
                          110 East 59th Street, Suite 3200
                          New York, New York 10022
                          *Counsel for Plaintiff*