UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHELE A. BAPTISTE,

                              Plaintiff,

              - against -

THE CITY UNIVERSITY OF NEW YORK, and
VINCENT BOUDREAU, in his individual and official
capacity,

                              Defendants.

22-CV-02785 (JMF)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8733

MATTHEW J. LAWSON
Assistant Attorney General
        *Of Counsel*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 2

    A.   The Parties ..................................................................................................................... 2

    B.   Plaintiff's 2015 Finding Regarding then-Dean Boudreau .............................................. 2

    C.   Boudreau Becomes Interim President in November 2016,
        and Plaintiff Continues in Her Role at the College ...................................................... 3

    D.   Plaintiff's Poor Performance Prompts the Federal Government
        to Issue Negative Findings Against the College in February 2017 ................................ 4

    E.   The OCR Issues a Second Decision Criticizing Plaintiff's Performance,
        and President Boudreau Learns of Additional Performance Lapses by Plaintiff ............ 5

    F.   President Boudreau Terminates Plaintiff for Poor Performance ................................... 6

    G.   Plaintiff Files This Action, and the Court Dismisses Most of the Claims ...................... 7

ARGUMENT ................................................................................................................................ 8

I.     THE REHABILITATION ACT CLAIMS AGAINST
      CUNY AND PRESIDENT BOUDREAU SHOULD BE DISMISSED ......................... 8

    A.   The Rehabilitation Act Claims Based on
        Plaintiff's Termination Fail as a Matter of Law ............................................................ 9

        1.   The Dodd-Related Allegations Fail to
            Establish a *Prima Facie* Case of Discrimination ............................................ 10

        2.   The Dodd-Related Allegations Also Fail
            Because Plaintiff Cannot Rebut Defendants' Showing
            that She Was Terminated for Legitimate, Non-Retaliatory Reasons ................ 12

        3.   The Rias-Related Allegations Are Unsupported by
            the Evidence and Do Not Show Pretext ........................................................... 15

i

    B.   Plaintiff Cannot Base a Retaliation Claim
       on the Other Alleged Workplace Slights .................................................................18

II.    THE SECTION 1981 RETALIATION CLAIM AGAINST
     PRESIDENT BOUDREAU SHOULD BE DISMISSED ....................................................21

    A.  The Section 1981 Claim Based on
       Plaintiff's Termination Fails as a Matter of Law ..............................................22

    B.  Plaintiff Cannot Base a Claim on the Other Alleged Workplace Slights ...........................23

III.   THE NYCHRL RETALIATION CLAIM AGAINST
     PRESIDENT BOUDREAU SHOULD BE DISMISSED ....................................................23

CONCLUSION.....................................................................................................................................25

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                                      **Page(s)**

*Agosto v. New York City Dep't of Educ.,*
   982 F.3d 86 (2d Cir. 2020) ............................................................................................10

*Abraham v. Leigh,*
   471 F. Supp. 3d 540 (S.D.N.Y. 2020) ...........................................................................14

*Allen v. St. Cabrini Nursing Home, Inc.,*
   198 F. Supp. 2d 442 (S.D.N.Y. 2002) ...........................................................................15

*Anderson v. City of New York,*
   No. 22-CV-3990, 2024 WL 183103 (S.D.N.Y. Jan. 17, 2024) .......................................9

*Ballard v. Children's Aid Soc'y,*
   781 F. Supp. 2d 198 (S.D.N.Y. 2011) ...........................................................................24

*Baptiste v. City Univ. of New York,*
   680 F. Supp. 3d 415 (S.D.N.Y. 2023) ...................................................................2, 7, 21

*Burlington N. & Santa Fe Ry. Co. v. White,*
   548 U.S. 53 (2006) ........................................................................................................19

*Cayetano v. Fed. Express Corp.,*
   No. 19 CV-10619, 2022 WL 2467735 (S.D.N.Y. July 6, 2022) .....................................10

*Clark Cnty. Sch. Dist. v. Breeden,*
   532 U.S. 268 (2001) ......................................................................................................10

*Davis v. Power of Auth.,*
   No. 19-CV-792, 2022 WL 309200 (S.D.N.Y. Feb. 2, 2022) ........................................8, 9

*DeMarco v. Holy Cross High Sch.,*
   4 F.3d 166 (2d Cir. 1993) ..............................................................................................14

*DeWitt v. Lieberman,*
   48 F. Supp. 2d 280 (S.D.N.Y.1999) ...............................................................................25

*Dipinto v. Westchester Cnty.,*
   No. 18-CV-00793, 2023 WL 1438721 (S.D.N.Y. Feb. 1, 2023) .....................................9

*Duplan v. City of N.Y.,*
   888 F.3d 612, 619 (2d Cir. 2018) ...................................................................................21

*Gonzalez v. City of New York,*
   845 F. App'x 11 (2d Cir. 2021).......................................................................................22

*Hardekopf v. Sid Wainer & Son*,
No. 02-CV-3251, 2004 WL 2199502 (S.D.N.Y. Sept. 29, 2004).......................................15

*Heiden v. New York City Health & Hosps. Corp.*,
No. 20-CV-10288, 2023 WL 171888 (S.D.N.Y. Jan. 11, 2023) .....................................14

*Henek v. CSC Holdings, LLC*,
449 F. Supp. 3d 35 (E.D.N.Y. 2020) ...................................................................................17

*Holcomb v. State Univ. of New York at Fredonia*,
698 F. App'x 30 (2d Cir. 2017) ............................................................................... 21, 22

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) ..........................................................................................8, 18

*Kalia v. City Univ. of New York*,
No. 19-CV-6242, 2020 WL 6875173 (S.D.N.Y. Nov. 23, 2020) ............................... 19, 20

*Kalra v. HSBC Bank USA, N.A.*,
567 F. Supp. 2d 385 (E.D.N.Y. 2008) .................................................................................14

*Khazin v. City of New York*,
No. 17-CV-3779, 2024 WL 1345739 (E.D.N.Y. Mar. 29, 2024) .....................................21

*Mabry v. Neighborhood Def. Serv.*,
769 F. Supp. 2d 381 (S.D.N.Y. 2011) .................................................................................21

*Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*,
703 F. Supp. 2d 230 (E.D.N.Y. 2010) .................................................................................14

*Ndongo v. Bank of China Ltd.*,
No. 22-CV-05896, 2023 WL 2215261 (S.D.N.Y. Feb. 24, 2023) .....................................24

*In re New York City Dep't of Educ.*,
No. 15-CV-7150, 2019 WL 1433163 (S.D.N.Y. Mar. 29, 2019) .....................................21

*Nunez v. Lima*,
762 F. App'x 65 (2d Cir. 2019)...........................................................................................19

*Robinson v. New York City Dep't of Educ.*,
No. 20-CV-3388, 2023 WL 9521512 (E.D.N.Y. Oct. 12, 2023) .....................................24

*Ruiz v. Cnty. Of Rockland*,
609 F.3d 486 (2d Cir. 2010) ...............................................................................................15

*Sarkis v. Ollie's Bargain Outlet*,
560 F. App'x 27 (2d Cir. 2014) ................................................................................... 13, 22

*Savino v. City of New York*,
331 F.3d 63 (2d Cir. 2003) ........................................................................8

*Scott-Robinson v. City of New York*,
No. 15-CV-09703, 2016 WL 7378775 (S.D.N.Y. Dec. 15, 2016) ..................24

*Selvam v. Experian Info. Sols., Inc.*,
651 F. App'x 29 (2d Cir. 2016) ..................................................................14

*Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*,
575 F.3d 199 (2d Cir. 2009) ........................................................................8

*Smith v. New York & Presbyterian Hosp.*,
440 F. Supp. 3d 303 (S.D.N.Y. 2020) ...........................................8, 11, 16

*Soloviev v. Goldstein*,
104 F. Supp. 3d 232 (E.D.N.Y. 2015) ........................................................25

*Sotomayor v. City of New York*,
862 F. Supp. 2d 226 (E.D.N.Y. 2012) ........................................................24

*Treglia v. Town of Manlius*,
313 F.3d 713 (2d Cir. 2002) ...........................................................8, 12, 13

*Ulrich v. Soft Drink, Brewery Workers & Delivery Emps.*,
425 F. Supp. 3d 234 (S.D.N.Y. 2019) ........................................................11

*Wilson v. Emhart Teknologies LLC*,
566 F. Supp. 2d 120 (D. Conn. 2008) ) ......................................................20

*Ya-Chen Chen v. City University Of New York*,
805 F.3d 59 (2d Cir. 2015) .........................................................13, 16, 24, 25

**New York State Cases**

*Brightman v. Prison Health Serv., Inc.*,
108 A.D.3d 739 (2d Dep't 2013) ................................................................24

**Federal Statutes**

42 U.S.C. § 1981 ....................................................................7, 21, 22, 23

42 U.S.C. § 1983 ...........................................................................21, 22

**New York Statutes**

N.Y.C. Admin. Code § 8–107(7) .................................................................................................................24

**Federal Rules**

Fed. R. Civ. P. 56(c) ...............................................................................................................................8

Defendants The City University of New York ("CUNY") and Vincent Boudreau, by their attorney, Letitia James, Attorney General of the State of New York, respectfully submit this memorandum of law in support of their motion for summary judgment.[1]

## PRELIMINARY STATEMENT

The reason Plaintiff was terminated from her position as Dean of Diversity, Compliance and Faculty Relations at the City College of New York is clear: Her performance was grossly deficient. On multiple occasions, Plaintiff failed to timely and adequately resolve internal complaints filed with City College's Office of Diversity and Compliance, which Plaintiff led. In certain instances, Plaintiff also failed to communicate adequately with complainants and other persons over the course of her office's investigations. The consequences of these performance lapses were severe. Indeed, Plaintiff's neglect of her responsibilities was so acute that it resulted in adverse findings by the Office for Civil Rights of the United States Department of Education in 2017 with respect to three different matters that had been entrusted to Plaintiff's office.

Unable to explain away this overwhelming evidence of poor performance, Plaintiff simply ignores it—her pleading in this case does not even mention the federal government's adverse findings. Instead, Plaintiff now advances the strained—and implausible—allegation that her termination was supposedly the product of retaliation. In particular, Plaintiff claims that City College President Vincent Boudreau terminated her in 2018 in order to exact revenge for Plaintiff's 2015 determination that Boudreau had retaliated against a faculty member named Lynda Dodd. Alternatively, Plaintiff claims she was terminated because she recommended granting a disability accommodation to an information technology employee named Curtis Rias in 2018, and because she

---

[1]    As used in this brief, "Boudreau Decl." refers to the Declaration of Vincent Boudreau, dated June 6, 2024; "Light Decl." refers to the Declaration of Jennifer Light, dated June 4, 2024; "Lawson Decl." refers to the Declaration of Matthew J. Lawson, dated June 10, 2024; and "56.1 SOF" refers to Defendants' Local Rule 56.1 Statement in support of this motion.

allegedly objected to President Boudreau's purported plan to retaliate against Rias. But there is no evidence to support these claims. Indeed, some of Plaintiff's factual allegations—including the allegation that President Boudreau made "unlawful threats" to retaliate against Mr. Rias—are fabrications that evaporated the moment Plaintiff was placed under oath during her deposition. Since there is <u>no</u> evidence to support Plaintiff's retaliation claims, let alone sufficient evidence on which a jury could reasonably find for Plaintiff, the Court should dismiss all of Plaintiff's claims and enter judgment in Defendants' favor.

## STATEMENT OF FACTS

### A.  The Parties

Defendant CUNY is a publicly-funded university system, and The City College of New York ("City College" or the "College") is one of CUNY's senior colleges. SAC ¶ 21. Plaintiff Michele Baptiste was employed at City College from June 2013 until April 26, 2018 as the Dean of Diversity, Compliance, and Faculty Relations. Lawson Decl. Ex. A at 31:10-24; SAC ¶ 105. In that role, Plaintiff was in charge of the Office of Diversity and Compliance (the "Diversity Office"). Boudreau Decl. ¶ 9. One of Plaintiff's principal duties was to oversee the investigation and resolution of internal discrimination and sexual misconduct complaints at the College, including complaints alleging discrimination based on race, ethnicity, gender and disability status. SAC ¶ 30; Boudreau Decl. ¶ 10.

Defendant Vincent Boudreau is the President of City College, a role he has held since December 4, 2017. Boudreau Decl. ¶ 1. Prior to his appointment as President, he served as the Interim President of City College between November 2016 and December 4, 2017. *Id.* ¶ 4.

### B.  Plaintiff's 2015 Finding Regarding Then-Dean Boudreau

Before his appointment to the role of Interim President, Defendant Boudreau was the Dean of the Colin Powell School for Civic and Global Leadership. Boudreau Decl. ¶ 4. In May or June

2015, then-Dean Boudreau attended a meeting with President Lisa Coico, who at that time was the President of the College. *Id.* ¶ 57; Lawson Decl. Ex. C at 13:11-14. [2] At this meeting, Dean Boudreau learned that Plaintiff had returned a partially negative finding against him after investigating allegations made by a faculty member named Lynda Dodd. *Id.* ¶ 58 & Ex. M (investigation report setting forth Plaintiff's findings). Ms. Dodd had made allegations of discrimination and retaliation against Dean Boudreau, and Plaintiff found that the discrimination allegations against him were unsubstantiated. Boudreau Decl. ¶ 58 & Ex. M at 8-9. However, Plaintiff found that the evidence substantiated the retaliation allegation against Dean Boudreau. *Id.*

President Coico told Dean Boudreau that he should not be concerned about the retaliation finding because it rested largely on a failure to supervise theory—and not on any specific act by Dean Boudreau. Boudreau Decl. ¶ 58. President Coico also told Dean Boudreau that no serious sanction or penalty was being contemplated against him as a result of the finding. *Id.* Plaintiff had recommended that a letter of reprimand be placed in Dean Boudreau's file, and she drafted a proposed letter for President Coico's signature. Boudreau Ex. M at 9; Lawson Decl. Ex. A (Baptiste Tr.) at 116:16-19; 127:4-128:12; *see also* Lawson Decl. Ex. F (draft letter of reprimand). However, former President Coico never issued Plaintiff's proposed letter or any other written reprimand to President Boudreau. Lawson Decl. Ex. C (Coico Tr.) at 51:18-21; *see also* Lawson Decl. Ex. A at 129:14-130:8 (Plaintiff has never seen a final version of the letter of reprimand).

### C. Boudreau Becomes Interim President in November 2016, and Plaintiff Continues in Her Role at the College

President Coico resigned in October 2016. Boudreau Decl. ¶ 5; SAC ¶ 58. Shortly thereafter, in November 2016, Dean Boudreau was appointed Interim President of the College. Boudreau Decl. ¶ 5; SAC ¶ 59. When President Boudreau assumed this role, he had the authority to

---

[2]     While former President Coico's deposition transcript is labeled, "Deposition Lisa Frances," she uses the surname "Coico" professionally. Lawson Decl. Ex. C at 11:13-18.

terminate employees who reported to him and who served at the pleasure of the President. Boudreau Decl. ¶ 62. This included Plaintiff. *Id.* However, in November 2016, President Boudreau was not yet dissatisfied with Plaintiff's performance. *Id.* Accordingly, Plaintiff remained in her position as Dean of Diversity, Compliance, and Faculty Relations. *Id.* Significantly, President Boudreau did replace certain other senior College Officials in the first few weeks of his Interim Presidency, including the former Vice President of Development, and the former Vice President of Communications. *Id.* ¶ 63.

### D. Plaintiff's Poor Performance Prompts the Federal Government to Issue Negative Findings Against the College in February 2017

The Office for Civil Rights (the "OCR") is an office within the United States Department of Education ("DOE") that, among, other things, enforces civil rights laws prohibiting discrimination in programs or activities that receive federal financial assistance from the DOE. Boudreau Decl. ¶ 12. Shortly after President Boudreau became Interim President in November 2016, he learned that the OCR was investigating allegations that the Diversity Office did not properly handle certain internal discrimination complaints that had been filed by two graduate students who alleged they had been sexually harassed. *Id.* ¶ 13. On February 16, 2017, the OCR issued a decision concluding that these students' complaints had <u>not</u> been handled properly—and that the improper handling of the complaints violated the complainants' rights. *Id.* ¶ 14 & Ex. D.

Among other things, the OCR found that the Diversity Office's investigation into these complaints took far too long. Boudreau Decl. ¶¶ 17, 22 & Ex. D at CUNY00001583, CUNY00001587. In particular, and measured from the time the initial complaint was submitted to the time the complainant was notified of the final result, the investigations of the two complaints took 166 days, and 150 days, respectively. *Id.* In contrast, CUNY's own procedures specify that, "whenever possible," the investigation of an internal complaint of discrimination or sexual misconduct "should be completed within sixty (60) calendar days of the receipt of the complaint."

*Id.* ¶ 11; *see also id.* Ex. D at CUNY00001587 n.21 (portion of the OCR's decision quoting this general rule).

In addition, the OCR found that the investigation of the first student's sexual harassment complaint was inadequate because two students who were identified as potential witnesses had not been interviewed. *Id.* ¶ 18 & Ex. D at CUNY00001583. Similarly, the OCR found that the investigation of the second student's complaint was "incomplete" because the "coordinator"—*i.e.*, Plaintiff—"did not make sufficient effort[s] to contact the professor or interview students or others who might have knowledge pertinent to [the] complaint." Boudreau Decl. ¶ 23 & Ex. D at CUNY00001587; *see also* 56.1 SOF ¶ 44 ("the coordinator," as used in the OCR's decision, refers to Plaintiff). Plaintiff was provided with a copy of the OCR's decision, and President Boudreau met with her to discuss ways the Diversity Office could improve its performance. Boudreau Decl. ¶¶ 27, 29; *see also* Lawson Decl. Ex. A at 187:2-13; 194:11-196:13.

As a result of its findings against the College, the OCR required the College to enter into a Resolution Agreement, dated February 14, 2017, which mandated, among other things, that the College conduct a review of all sexual harassment complaints filed with the Diversity Office "during and since" the academic year 2015-2016. Boudreau Decl. ¶ 26. This case review revealed additional problems. In particular, there were several instances in which the Diversity Office had failed to notify one or both parties to an internal complaint of the results of a completed investigation (or, at minimum, there were no records of any such notification). *Id.* ¶ 31; Light Decl. ¶ 11.

### E. The OCR Issues a Second Decision Criticizing Plaintiff's Performance, and President Boudreau Learns of Additional Performance Lapses by Plaintiff

In the summer of 2017, President Boudreau learned that the OCR had opened another investigation into the Diversity Office's handling of a complaint lodged by yet another student complainant. Boudreau Decl. ¶ 32. The OCR issued its findings from this additional investigation by letter dated October 16, 2017. *Id.* ¶ 33 & Ex. E. Among other things, the OCR concluded that

Plaintiff had simply ignored the student's complaint. Boudreau Decl. ¶ 35 & Ex. E at CUNY00001569. The OCR found that the complaint in question was forwarded to Plaintiff, *i.e.*, the "Chief Diversity Officer," on January 18, 2017. *Id.* According to the OCR, however, as of October 16, 2017, "neither the Chief Diversity Officer, nor anyone else at the College [had taken] action with respect to the complainant's email or otherwise followed-up on his concerns." *Id.; see also* 56.1 SOF ¶ 64 (the "Chief Diversity Officer," as used in the OCR's decision, refers to Plaintiff).

Once again, the College was required by the OCR to resolve the matter by implementing a resolution agreement with the OCR that required the College to take remedial measures and report the results back to the OCR. Boudreau Decl. ¶ 36 & Ex. E at CUNY00001571-72. Plaintiff was provided copies of the OCR's second decision and accompanying resolution agreement. Boudreau Decl. ¶ 37.

Over the course of 2017 and early 2018, President Boudreau learned that Plaintiff had committed additional performance lapses. For example, in February 2018, a psychology professor, Vivien Tartter, contacted President Boudreau about a discrimination complaint that had been filed against her in June 2017—but which Plaintiff had failed to resolve. Boudreau Decl. ¶¶ 40-42. Even though that complaint had been on file for months, Plaintiff had let the accompanying investigation languish—and ceased responding to the respondent, Ms. Tartter. *Id.*

### F. President Boudreau Terminates Plaintiff for Poor Performance

Based on the OCR's negative findings, and Plaintiff's other performance lapses, President Boudreau concluded that Plaintiff had demonstrated a clear pattern of failing to promptly address internal complaints that had been filed with the Diversity Office, with some investigations taking far too long. Boudreau Decl. ¶ 45. In certain instances, Plaintiff had also failed to promptly respond to complainants' inquiries and/or otherwise failed to properly communicate over the course of her Office's investigations. *Id; see also* Lawson Decl. Ex. B (Boudreau Tr.) at 170-20-173:9; 293:11-294:6.

For these reasons, President Boudreau terminated Plaintiff on April 26, 2018.  Boudreau Decl. ¶ 50.

Subsequent developments would further confirm that terminating Plaintiff was the only responsible decision that President Boudreau could have made.  A few days after Plaintiff left the College, her successor, Jennifer Light, arrived at the Diversity Office to discover that Plaintiff had left that office "disorganized beyond belief."  Boudreau Decl. ¶ 53 & Ex. I; Light Decl. ¶ 15.  As Ms. Light sorted through the chaotic piles of paperwork over the following month and a half, she would come to learn there were scores of individual incidents reported to the Diversity Office during Plaintiff's tenure that had not been formally investigated and/or had not been properly closed. Boudreau Decl. ¶ 55 & Exs. K, L; Light Decl. ¶¶ 17-18.

### G.  Plaintiff Files This Action, and the Court Dismisses Most of the Claims

Plaintiff filed this action against CUNY and President Boudreau on April 4, 2022 (ECF 1). On September 16, 2022, Plaintiff filed her current pleading, the Second Amended Complaint (ECF 18) ("SAC").  The SAC originally asserted a retaliation claim against CUNY and President Boudreau under the Rehabilitation Act, along with a number of discrimination and retaliation claims that were asserted solely against President Boudreau under federal, State, and City law.

Defendants filed a motion to dismiss, and, on June 29, 2023, the Court issued a decision granting in part, and denying in part, that motion.  *See Baptiste v. City Univ. of New York*, 680 F. Supp. 3d 415 (S.D.N.Y. 2023).  In particular, the Court dismissed all of Plaintiff's discrimination claims, her Rehabilitation Act claim against President Boudreau in his individual capacity, her retaliation claim under the Equal Protection Clause, and her retaliation claim under the New York State Human Rights Law ("NYSHRL"). *Baptiste*, 680 F. Supp. 3d at 427.

As a result of the Court's ruling, only three claims now survive in this action: (1) a retaliation claim under the Rehabilitation Act against CUNY and President Boudreau in his official capacity; (2) a retaliation claim against President Boudreau under 42 U.S.C. § 1981; and (3) a retaliation claim

against President Boudreau under the New York City Human Rights Law ("NYCHRL"). *Baptiste*, 680 F. Supp. 3d at 428. For the reasons set forth below, all of Plaintiff's remaining claims should now be dismissed.

## ARGUMENT

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003). In order to avoid summary judgment, the nonmoving party must do more than show "metaphysical doubt" as to the material facts. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Rather, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact and may not rely upon conclusory allegations or speculation. *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009); *Jeffries,* 426 F.3d at 554.

## I.    THE REHABILITATION ACT CLAIMS AGAINST CUNY AND PRESIDENT BOUDREAU SHOULD BE DISMISSED

Retaliation claims under the Rehabilitation Act are analyzed under the *McDonnell Douglass* burden-shifting framework. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *see also Davis v. Power of Auth.*, No. 19-CV-792, 2022 WL 309200, at *15 (S.D.N.Y. Feb. 2, 2022). Under this framework, a Plaintiff must first establish a *prima facie* case of retaliation by showing that: (1) she engaged in protected activity;[3] (2) the employer was aware of this activity; (3) the employer took adverse employment action against Plaintiff; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Treglia,* 313 F.3d at 719; *Davis*, 2022 WL 309200, at *14; *see also Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 340 (S.D.N.Y. 2020) (applying the *McDonnell Douglas* framework in the Title VII context).

---

[3]    Protected activity is "action taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Davis*, 2022 WL 309200 at *15 (quoting *Treglia*, 313 F.3d at 721). "If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit [the jury] to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Davis*, 2022 WL 309200, at *15 (quoting *Treglia*, 313 F.3d at 721 (internal quotation marks omitted)).

Further, retaliation claims under the Rehabilitation Act are subject to the "but-for" causation standard. *Anderson v. City of New York*, No. 22-CV-3990, 2024 WL 183103, at *11 (S.D.N.Y. Jan. 17, 2024); *Robinson v. New York City Dep't of Educ.*, No. 20-CV-3388, 2023 WL 9521512, at *11 (E.D.N.Y. Oct. 12, 2023). Under this standard, there must be evidence upon which a jury could find that Plaintiff's "termination would not have occurred in the absence of a retaliatory motive." *Dipinto v. Westchester Cnty.*, No. 18-CV-00793, 2023 WL 1438721, at *10 (S.D.N.Y. Feb. 1, 2023).

As set forth below, Plaintiff cannot maintain a Rehabilitation Act Claim based on her termination (Point I(A), *infra*), or any other purported workplace slight she supposedly endured (Point I(B), *infra*).

### A.  The Rehabilitation Act Claims Based on Plaintiff's Termination Fail as a Matter of Law

Plaintiff's Rehabilitation Act claims advance two different theories for why Plaintiff was supposedly terminated. First, Plaintiff contends that President Boudreau terminated her in order to exact revenge following her determination, in 2015, that Boudreau had retaliated against Lynda Dodd. Second, Plaintiff claims that President Boudreau terminated her because she (i) recommended granting a disability accommodation to Curtis Rias in 2018 (which the President supposedly opposed) and (ii) objected to President Boudreau's alleged "threats" to retaliate against Rias. Plaintiff cannot create a fact issue with respect to either of these baseless theories.

1.    **The Dodd-Related Allegations Fail to
Establish a** *Prima Facie* **Case of Discrimination**

Plaintiff's allegations about her alleged advocacy on behalf of Lynda Dodd fail to establish a

*prima facie* case of retaliation because they are unsupported by any evidence of causation.  For

example, while evidence of temporal proximity between protected activity and adverse action can

sometimes support a *prima facie* showing of causation, *see, e.g., Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S.

268, 273 (2001), there is <u>no</u> such temporal proximity here.

Plaintiff claims she engaged in two different instances of protected activity relating to Lynda

Dodd, both of which took place by June 2015 at the latest.  <u>First</u>, Plaintiff asserts that she issued

"findings on Dr. Dodd's discrimination and retaliation complaints on June 29, 2015."  SAC ¶¶ 49-

50.  <u>Second</u>, Plaintiff asserts that she made "recommendations" regarding remedial measures to be

taken in light of those findings, including a recommendation to issue a "letter of reprimand" to

Boudreau.  *Id.* ¶ 51-52.  These "recommendations" were issued at the same time—and in the same

2015 investigative report—as Plaintiff's findings.  *See* Boudreau Ex. M at 7-9 (May 21, 2015

investigative report setting forth Plaintiff's findings and recommendations); *see also* Lawson Decl. Ex.

E (Plaintiff's June 30, 2015 email transmitting these findings and recommendations to Lynda Dodd).

The lengthy gap between protected activity (in 2015) and adverse action (in 2018) defeats

any showing of temporal proximity.  Indeed, even counting from when President Boudreau rose to a

position where he could supposedly retaliate, *i.e.*, when he became Interim President in November

2016, nearly a year and a half had passed before President Boudreau terminated Plaintiff's

employment on April 26, 2018.  This is far too long to support a retaliation claim.  *See Agosto v. New*

*York City Dep't of Educ.,* 982 F.3d 86, 104 (2d Cir. 2020) ("a gap of more than several months is

typically too long by itself to survive summary judgment") (cleaned up); *Cayetano v. Fed. Express Corp.*,

No. 19-CV-10619, 2022 WL 2467735, at *10 (S.D.N.Y. July 6, 2022) (holding that plaintiff could not

make a *prima facie* showing of causation given the "three-month gap between the protected activity

and the adverse action"); *Smith*, 440 F. Supp. 3d at 343 (three-month, and four-month, gaps insufficient to yield an inference of causal connection on a summary judgment motion)[4].

There also is no other evidence that could establish a *prima facie* showing of causation. Plaintiff's pleading attempted to raise an inference of causation by alleging that (1) President Coico "admonished" then-Dean Boudreau as a result of Plaintiff's findings; (2) Coico "had [a] letter of reprimand . . . placed in Boudreau's personnel file"; and (3) these alleged developments supposedly "humiliated" Dean Boudreau to the point that he felt compelled to fire Plaintiff nearly three years later. SAC ¶¶ 5, 55, 6. But this pleaded narrative finds no support in the evidence—and these purported "facts" would be wholly insufficient to establish causation in any event.

First, there is no evidence that President Coico "admonished" Dean Boudreau. To the contrary, Plaintiff testified that Dr. Coico simply informed Dean Boudreau that Plaintiff "had concluded [her] investigation and what the findings of the report w[ere] as it related to . . . him." Lawson Decl. Ex. A at 118:20-25. If anything, President Coico sought to downplay the seriousness of Plaintiff's findings and recommendations as to Dean Boudreau. *See* Boudreau Decl. ¶ 58.

Second, while "Plaintiff recommended to Coico . . . that a letter of reprimand be placed in [Dean] Boudreau's personnel file," SAC ¶ 51, the uncontroverted evidence establishes that President Coico rejected that recommendation. As former President Coico testified, "I didn't give him a formal write-up." Lawson Decl. Ex. C at 51:18-21. Not surprisingly, the only version of Plaintiff's proposed letter of reprimand that exists in the record is an unsigned draft that Plaintiff prepared for President Coico's signature. *See* Lawson Decl. Ex. 6 (Plaintiff's draft letter of reprimand). Plaintiff

---

[4]     Moreover, Plaintiff cannot manufacture temporal proximity by pointing to some other person's protected activity (such as Lynda Dodd's 2017 lawsuit). Rather, a retaliation claim must be supported by reference to a plaintiff's own protected activity. *See Ulrich v. Soft Drink, Brewery Workers & Delivery Emps.*, 425 F. Supp. 3d 234, 244 (S.D.N.Y. 2019) (a co-plaintiff's reference to letter written by other person was unavailing, and that plaintiff's failure to allege some engagement "that could constitute his *own* protected activity [was] fatal to his retaliation claim") (italics in original).

testified that she has never seen a final version of this document. Lawson Decl. Ex. A at 129:14-130:8.

Third, there is no evidence that Dean Boudreau was "humiliated" by Plaintiff's findings and recommendations. During her deposition, Plaintiff could recall only one conversation with Dr. Boudreau about her findings in the Lynda Dodd matter—the discussion described above in which Dean Boudreau was informed about those findings for the first time. Lawson Decl. Ex. A at 120:11-16. Yet Plaintiff could not recall any response from Dean Boudreau "other than, okay." Lawson Decl. Ex. A at 119:2-5. Further, Dr. Boudreau faced no negative professional consequences from Plaintiff's 2015 actions. Boudreau Decl. ¶ 61. To the contrary, he was appointed Interim President, and then President, in the years that followed. *Id.* ¶¶ 61, 1, 4.

Plaintiff's theory of retaliation is also facially implausible. For example, there is no evidence that could explain why, if Plaintiff's 2015 findings and recommendations were the reason for her termination, President Boudreau did not terminate Plaintiff when he first had the opportunity, *i.e.*, when he became Interim President in November 2016. President Boudreau was perfectly capable of terminating his direct reports at that time; in fact, he <u>did</u> terminate certain other direct reports in the first few weeks of his Interim Presidency, including the former Vice President of Development, and the former Vice President of Communications. Boudreau Decl. ¶ 63.

> **2. The Dodd-Related Allegations Also Fail**
> **Because Plaintiff Cannot Rebut Defendants' Showing**
> **That She Was Terminated for Legitimate, Non-Retaliatory Reasons**

Even if Plaintiff could make out a *prima facie* case of retaliation with respect to her Dodd-related allegations, she still cannot defeat summary judgment. Rather, the analysis would advance to step two of the *McDonnell Douglas* test, which requires Defendants "to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia*, 313 F.3d at 721.

Defendants have easily satisfied this burden. Indeed, the evidence overwhelmingly shows that Plaintiff was terminated for poor performance and, in particular, because of her pattern of (i) failing to promptly address internal complaints that had been filed with the Diversity Office and (ii) failing to properly communicate with complainants and others over the course of the Diversity Office's investigations. Boudreau Decl. ¶¶ 45-47; Lawson Decl. Ex. B at 170:20-173:9, 293:11-294:6. These problems were so severe that they prompted the OCR to issue negative findings against the College with respect to the Diversity Office's handling of three different complaints, as set forth in OCR's decisions dated February 16, 2017 and October 16, 2017. *See* Boudreau Decl. ¶¶ 12-38 & Exs. D, E. Further evidence of Plaintiff's poor performance continued to be revealed even after the OCR's findings. Boudreau Decl. ¶¶ 39-44 (discussing Plaintiff's additional performance lapses).

Since Defendants have articulated legitimate, non-retaliatory reasons for the decision to terminate Plaintiff, "the presumption of retaliation dissipates," *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015), and the burden shifts back to Plaintiff. *See Treglia*, 313 F.3d at 721; *Ya-Chen Chen*, 805 F.3d at 70. To meet her burden at this stage, Plaintiff must do far more than simply state a *prima facie* case. Instead, she must come forward with sufficient admissible evidence on which a jury could reasonably find that Plaintiff's advocacy for Lynda Dodd was the but-for cause of her termination. *Ya-Chen Chen*, 805 F.3d at 70; *see also Sarkis v. Ollie's Bargain Outlet*, 560 F. App'x 27, 30 (2d Cir. 2014) (after employer articulates legitimate non-retaliatory reasons, "the employee must show that the proffered reason was pretextual and that retaliation was the but-for cause for the adverse employment action") (citation omitted).

There is no such evidence. To the contrary, as set forth above, the evidence confirms that Plaintiff's termination had nothing to do with the Lynda Dodd matter. *See* Point I(A)(1), *supra*. Moreover, while Plaintiff has attempted to claim that her performance was adequate and/or that there were excuses for her poor performance, such allegations do not establish pretext. At this stage

13

of the *McDonnell Douglas* inquiry, the question is not whether "the performance-based justification"

that Defendants have articulated is "accurate or fair, but whether plaintiff can show any evidence

that it was <u>not the actual justification</u>." *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230,

247 (E.D.N.Y. 2010) (emphasis added) (citing *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170-71 (2d

Cir. 1993)). Thus, "the mere fact that an employee disagrees with an employer's evaluation of that

employee's . . . deficient performance, or even has evidence that the decision was objectively

incorrect" does not by itself establish pretext. *Heiden v. New York City Health & Hosps. Corp.*, No. 20-

CV-10288, 2023 WL 171888, at *23 (S.D.N.Y. Jan. 11, 2023); *accord Kalra v. HSBC Bank USA, N.A.*,

567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008) (collecting cases).

  Plaintiff's allegation that President Boudreau offered "shift[ing]" explanations for his

termination decision, SAC ¶ 113, also fails to demonstrate pretext—and is wholly unsupported by

the record. Plaintiff's "shifting explanations" argument depends on her contention that "Boudreau

announced at [an April 26, 2018] union meeting that Plaintiff had been terminated for 'financial

reasons.'" *Id.* But Boudreau never said any such thing, *see* Boudreau Decl. ¶ 80, and there is no

admissible evidence that he did. Significantly, Plaintiff was not present at this union meeting, and

she attempts to support her claims about what was said at that meeting solely through inadmissible

hearsay, including a "summary of the meeting" drafted by the union (*i.e.*, the meeting minutes), and

the alleged out-of-court statements of an attendee (which she endeavored to report secondhand).

Lawson Decl. Ex. A at 212:7-218:11; Boudreau Ex. O. This hearsay evidence cannot be considered

on this motion. *See Abraham v. Leigh*, 471 F. Supp. 3d 540, 554 (S.D.N.Y. 2020) (party opposing

summary judgment "cannot rely on inadmissible hearsay" absent a showing that admissible evidence

will be available at trial) (quoting *Selvam v. Experian Info. Sols., Inc.*, 651 F. App'x 29, 31-32 (2d Cir.

2016)). In any event, Plaintiff admits that the meeting minutes <u>do not</u> claim that Boudreau said

Plaintiff was fired for financial reasons, Lawson Decl. Ex. A at 216:11-14, so they could not create a fact issue even if they were properly considered on this motion.

Nor can Plaintiff create a fact issue on pretext by pointing to the allegedly deficient qualifications of her successors in the Chief Diversity Officer role. *See* SAC ¶¶ 119, 124 (claiming that former Interim Chief Diversity Officer Jennifer Light and former Chief Diversity Officer Diana Cuozzo lacked sufficient experience in diversity and inclusion). Where, as here, a plaintiff seeks to raise an inference of discrimination or retaliation by pointing to the circumstances faced by alleged comparators, those comparators must be <u>similarly situated</u> to the plaintiff. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010); *Allen v. St. Cabrini Nursing Home, Inc.,* 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002). Among other things, this means that such comparators must have committed the same types of conduct that led to the adverse actions against Plaintiff herself. *See Ruiz v.*, 609 F.3d at 493-94 (to be similarly situated to plaintiff, alleged comparator must have "engaged in comparable conduct"); *accord Hardekopf v. Sid Wainer & Son*, No. 02-CV-3251, 2004 WL 2199502, at *7 (S.D.N.Y. Sept. 29, 2004). Here, as in *Hardekopf*, "Plaintiff has not shown, or even alleged, that any other similarly situated employee performed poorly to a substantially similar degree but escaped termination." 2004 WL 2199502, at *7. Indeed, there is no evidence of <u>any</u> performance lapses by Ms. Light and/or Ms. Cuozzo—let alone any evidence of performance lapses so severe that they prompted the federal government to issue negative findings against City College. Given Plaintiff's uniquely deficient performance in this regard, there is <u>no</u> individual who could conceivably be "similarly situated" to Plaintiff.

### 3. The Rias-Related Allegations Are Unsupported by the Evidence and Do Not Show Pretext

Plaintiff's remaining theory—that Boudreau fired Plaintiff because he was angry that Plaintiff (i) recommended granting a disability accommodation for Curtis Rias in 2018; and (ii) objected to Boudreau's alleged "threats of retaliation against Rias" is also unavailing.

Again, since Defendants have explained their legitimate, non-retaliatory reasons for terminating Plaintiff, she must do far more than simply make out a *prima facie* case. In this regard, the bare-bones "temporal proximity" arguments that Plaintiff has previously relied upon are of no assistance to her now. *See Smith*, 440 F. Supp. 3d at 344 (noting that "while temporal proximity can support a causal connection at the *prima facie* stage, it is insufficient to defeat summary judgment at the pretext stage") (cleaned up). Instead, Plaintiff must come forward with sufficient evidence on which a jury could reasonably find that Plaintiff's alleged disability-related advocacy for Curtis Rias was the but-for cause of her termination. *See Ya-Chen Chen*, 805 F.3d at 70. Plaintiff cannot do so.

In fact, there is no evidence that Plaintiff even <u>engaged</u> in any disability-related "advocacy" for Rias during her conversations with President Boudreau—and there is certainly no evidence that this alleged advocacy caused President Boudreau to fire Plaintiff (a scenario that is implausible in the extreme, *see* Boudreau Decl. ¶¶ 68-69).

By way of background, Plaintiff testified that she only worked on Curtis Rias's request for a disability accommodation at the appeal level. Lawson Decl. Ex. A at 142:9-20; *see also id.* at 53: 21-54:4. In particular, after the Human Resources Department denied Rias's initial request for accommodation, Rias appealed that decision directly to Plaintiff, and Plaintiff evaluated that appeal. *Id.* at 136:8-137:23. But, far from recommending any specific outcome to President Boudreau, Plaintiff simply told him that (i) Rias had made an accommodation request that had been appealed to her Office; and, allegedly, that (ii) Plaintiff planned to work with the Facilities Department to resolve that appeal. *Id.* at 150:14-25; 152:10-14. At her deposition, Plaintiff could not remember saying anything else to the President about the matter. *Id.* at 161:2-8. Of particular importance here, Plaintiff testified that she could not recall ever telling President Boudreau how she planned to resolve Rias's accommodation appeal, or what her recommendations might be. *Id.* at 158:7-12; 160:20-25; 161:2-8.

To be sure, Plaintiff testified that she did convey her ultimate recommendation that Rias's appeal be granted to "Vince's counsel." *Id.* at 265:22-266:17. But even if this were true, and even if counsel thereafter communicated this alleged information to Boudreau (and there is no evidence that counsel did so), Plaintiff admitted that she did not have "any knowledge" about what Boudreau's reaction to any such disclosure was. *Id.* at 267:13-21. Plaintiff could not say whether Boudreau agreed with her recommendation, because "I didn't speak to Vince. So I don't know. . . what his thoughts were." *Id.* at 267:22-25. In fact, during her testimony, Plaintiff could not identify a single specific thing that President Boudreau said about Curtis Rias <u>at any time.</u> *Id.* at 170:4-7.

And far from offering any support for Plaintiff's absurd claim that the prospect of granting an accommodation to Mr. Rias caused President Boudreau to terminate her, the undisputed evidence shows that President Boudreau <u>ultimately supported</u> providing such an accommodation. In or about August 2018, President Boudreau directed that an accommodation be <u>granted</u> to Mr. Rias in response to his appeal. Boudreau Decl. ¶ 69 & Ex. N[5].

Plaintiff's other allegation in the SAC—*i.e.*, that President Boudreau supposedly made "unlawful threats" to retaliate against Rias in response to his request for accommodation and/or his alleged complaints of discrimination—is a fabrication that is wholly devoid of evidentiary support. *Cf. Henek v. CSC Holdings, LLC,* 449 F. Supp. 3d 35, 38 n.2 (E.D.N.Y. 2020) (a "complaint . . . is not evidence with which a party can oppose a motion for summary judgment") (collecting cases).

Indeed, Plaintiff's false allegations about these alleged "threats" tellingly evaporated the moment she was placed under oath at her deposition. Plaintiff was asked, again and again, what President Boudreau supposedly told her about Curtis Rias, and <u>she could not identify a single</u>

---

[5]    Before filing Exhibit N to President Boudreau's deposition, counsel for Defendants redacted a single word that identifies Mr. Rias's medical condition. *See* Boudreau Ex. N (referring to "your documented medical condition of [redacted]." The other redaction appearing on this document (*i.e.*, the redaction of Mr. Rias's personal address) was made prior to production.

specific thing that Boudreau said about Rias at any time—let alone any purported "threats." Lawson

Decl. Ex. A at 170:4-7 (Plaintiff cannot remember anything specific that Boudreau said about Rias);

*id.* at 168:9-22 (Plaintiff testifies, "I don't remember what [Boudreau] specifically said" at meeting

regarding Rias that was called by Senior Vice President Len Zinnanti); *id.* at 168:23-169:16 (Plaintiff

does not recall any other meetings or discussions with Boudreau about Rias); *id* 169:17-170:3

(Plaintiff does not recall any conversations by telephone or email with Boudreau about Rias); *id.* at

161:22-162:3 (Plaintiff is again asked to identify anything Boudreau said about Rias and fails to do

so); *id.* at 162:4-24 (same).

The closest that Plaintiff came to identifying something that President Boudreau said about

Rias are certain conclusory—and speculative—assertions about the alleged "sentiment of the room,"

and/or the "focus" of the participants, during a meeting that Plaintiff merely "believe[s]" President

Boudreau attended, along with five other attendees. Lawson Decl. Ex. A at 163:20-168:22; *see also id.*

at 152:18-153:7. But when Plaintiff was asked to clarify who among the six attendees supposedly

had this "focus," Plaintiff could not identify any particular person, let alone any specific remarks that

person made. *Id.* at 165:14-18. In the absence of any evidence about what President Boudreau

actually said (if anything), Plaintiff's assertions amount to nothing more than inadmissible

speculation about the attendees' collective mental state. *See Jeffreys,* 426 F.3d at 554 (party opposing

summary judgment cannot rely on speculation).

### B. Plaintiff Cannot Base a Retaliation Claim on the Other Alleged Workplace Slights

In addition to her termination, Plaintiff identifies four other alleged workplace slights that

she purports to attribute to President Boudreau. Specifically, Plaintiff claims that President

Boudreau allegedly (1) "disbanded . . . former President Coico's Council on Inclusiveness

Excellence" [*sic*] (the "President's Council)" SAC ¶ 68; (2) "kept Plaintiff's department . . .

understaffed and underfunded," *id.* ¶ 77; (3) reduced the schedule of the Diversity Office's part-time

investigator, *id.* ¶ 78; and (4) reduced his interactions with Plaintiff, and stopped having monthly meetings with her, during the last four months of Plaintiff's employment at the College, *id.* ¶ 101.

These allegations do not identify any adverse employment action, and thus fail to support a *prima facie* showing of retaliation.  As the Supreme Court has emphasized, not every alleged slight will qualify as an adverse employment action in a retaliation case.  Rather, only actions that "produce[] an injury or harm" can qualify. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  In particular, the action must be adverse to the point that "[i]t well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks omitted); *see also Nunez v. Lima*, 762 F. App'x 65, 69 (2d Cir. 2019) (same). The four slights alleged here do not meet these standards, and in any event the underlying allegations are unsupported by the evidence (and otherwise fail as a matter of law).  For example:

- There is no competent evidence that President Boudreau "disbanded" the President's Council, *see* Boudreau Decl. ¶ 70, and Plaintiff's conclusory allegations about this alleged "disbanding" could not even withstand a motion to dismiss—let alone a motion for summary judgment.  In fact, in *Kalia v. City Univ. of N.Y.*, No. 19-CV-6242, 2020 WL 6875173, at *2 (S.D.N.Y. Nov. 23, 2020) (Furman, J.), the plaintiff made a virtually identical allegation, asserting that "Boudreau helped dismantle the President's Council on Diversity."  The Court "[d]isregard[ed]" this "conclusory allegation[]" and dismissed the underlying retaliation claims for failure to state a claim.  *Id.* at *6.  In any event, during her deposition, Plaintiff could not identify a single, concrete example of how this supposed "disbanding" harmed her or the work of her office—which confirms that no adverse employment action took place. *See* Lawson Decl. Ex. A at 101:20-103:23; *Burlington*, 548 U.S. at 68 (no adverse employment action in the absence of "injury or harm").

19

- While Plaintiff may well believe that her office was "understaffed and underfunded," there is <u>no</u> evidence that President Boudreau did anything to bring about this alleged state of affairs, and these allegations do not identify an adverse employment action in any event. *See, e.g., Wilson v. Emhart Teknologies LLC*, 566 F. Supp. 2d 120, 124 (D. Conn. 2008) (alleged "misallocation of human-resources staff" was not adverse employment action). Nor is there any evidence that these staffing and funding levels were changed within a short time after Plaintiff's protected activity (*i.e.*, no causation). *See Kalia*, 2020 WL 6875173, at *6 (dismissing retaliation claims, where, *inter alia*, Plaintiff failed to "establish precisely when any of the other alleged retaliatory actions took place" in relation to Plaintiff's protected activity).

- There is likewise no competent evidence that President Boudreau "reduced" the schedule of the Diversity Office's investigator, *see* Boudreau Decl. ¶¶ 75-76. Indeed, Plaintiff initially attributed this alleged reduction to "issues surrounding the budget"— and not to any specific action by Boudreau. Lawson Decl. Ex. A at 70:21-71:12; 73:22-74:19.[6] Further, there is no evidence of a causal connection between the alleged reduction and Plaintiff's protected activity. *See Kalia*, 2020 WL 6875173, at *6 (dismissing retaliation claims, where, *inter alia*, Plaintiff failed to "establish precisely when any of the other alleged retaliatory actions took place" in relation to Plaintiff's protected activity). And, as discussed, this alleged action is not an adverse employment action. *See, e.g.,* Lawson Decl. Ex. A at 89:13-18, *id.* at 92:12-20 (Plaintiff never told anyone that the alleged reduction of hours would harm the work of the Diversity Office).

---

[6]    Plaintiff's alleged knowledge about such "issues" is based entirely on inadmissible hearsay in any event. *See id.* at 74:13-19 (Plaintiff testifies that she is relying on "what LaWanda communicated to me").

- Finally, the allegation that President Boudreau reduced his interactions with Plaintiff, and stopped having monthly meetings with her, during the last four months of Plaintiff's employment at the College does not identify any adverse employment action. *See Khazin v. City of New York*, No. 17-CV-3779, 2024 WL 1345739, at \*8 (E.D.N.Y. Mar. 29, 2024) (allegation that plaintiff was not invited to meetings "does not rise to the level of an adverse employment action" for retaliation purposes); *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011) (same).

## II. THE SECTION 1981 RETALIATION CLAIM AGAINST PRESIDENT BOUDREAU SHOULD BE DISMISSED

In contrast to Plaintiff's Rehabilitation Act claim, which is limited to allegations of disability-based retaliation, "Section 1981 applies only to race-based retaliation." *Baptiste*, 680 F. Supp. 3d at 425. As applied to the facts here, this means that the Section 1981 claim is limited to Plaintiff's allegations that she was subject to one or more adverse employment actions because of her purported <u>race-based</u> advocacy for Curtis Rias.[7]

Further, when a plaintiff purports to sue a state actor under 42 U.S.C. § 1981—as Plaintiff does here—the court should construe that claim as a "cause[] of action brought under § 1983 and discuss whether the claim[] can survive pursuant to § 1983 caselaw." *In re New York City Dep't of Educ.*, No. 15-CV-7150, 2019 WL 1433163, at \*5 (S.D.N.Y. Mar. 29, 2019); *see also Duplan v. City of N.Y.*, 888 F.3d 612, 619, 621 (2d Cir. 2018) (§ 1983 provides the exclusive federal remedy for the violation of the rights guaranteed in § 1981 in suits against state actors); *see also* SAC at p. 26 (Plaintiff asserts that her § 1981 claim is "[a]ctionable under Section 1983").

Section 1983 retaliation claims, like retaliation claims under the Rehabilitation Act, are evaluated under burden-shifting *McDonnell Douglas* framework. *Holcomb v. State Univ. of New York at*

---

[7]    Stated differently, Plaintiff's allegations that she was supposedly terminated for engaging in <u>disability-based</u> advocacy for Lynda Dodd and/or for Curtis Rias are not properly part of her Section 1981 claim.

*Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017).  *See also* Point I, *supra* (setting forth the steps of the *McDonnell Douglas* analysis).  Section 1983 retaliation claims are also subject to the "but-for" causation standard.  *Gonzalez v. City of New York*, 845 F. App'x 11, 14 (2d Cir. 2021).  As discussed below, Plaintiff cannot maintain a retaliation claim based on either her termination <u>or</u> on any other workplace slights that she purports to allege.

### A.  The Section 1981 Claim Based on Plaintiff's Termination Fails as a Matter of Law

Plaintiff's Section 1981 claim, as actionable through Section 1983, relies on two discrete instances of protected activity that supposedly led to Plaintiff's firing.  <u>First</u>, Plaintiff claims that she "expressly objected" to President Boudreau's alleged "threats of retaliation" against Curtis Rias in response to Rias's filing of an EEOC charge (which had made claims of racial discrimination).  *See* SAC ¶ 100.  <u>Second</u>, Plaintiff claims that she announced during a meeting that it would "appear to be retaliatory" if the College began conducting performance retaliations of Mr. Rias, given Mr. Rias's previous filing of an "external complaint" with the EEOC.  Lawson Decl. Ex. A at 154:18-24, 145:22-146:22; *see also* SAC ¶ 97.

Plaintiff's race-based retaliation claim is entirely unavailing.  Indeed, there is no evidence to support this claim—let alone sufficient evidence to enable a jury to conclude that Plaintiff's "advocacy" for Curtis Rias was the but-for cause of her termination.  *See Sarkis*, 560 F. App'x at 30 (once employer articulates its legitimate reason for the adverse action, the employee "must show that the proffered reason was pretextual and that retaliation was the but-for cause for the adverse employment action").

In this regard, Plaintiff's first theory of retaliation—*i.e.*, that she was fired because she "expressly objected" to Boudreau's alleged "threats" against Rias—is easily dispensed with.  Indeed, as discussed in detail above, Plaintiff's false allegations about these "threats" are a fabrication that finds no support in Plaintiff's testimony or any other evidence. *See* Point I(A)(3) *supra* (citing

Plaintiff's testimony).  Since there never were any "threats" by Boudreau, let alone any "objections" to such threats by Plaintiff, she could not even demonstrate a *prima facie* case of either protected activity <u>or</u> causation—and she certainly could not satisfy the more onerous burden to show pretext.

Plaintiff's other theory—which posits that President Boudreau fired Plaintiff because he was unhappy with Plaintiff's alleged announcement that it would "appear retaliatory" to begin performance evaluations of Mr. Rias given his previous filing of an EEOC charge—also fails. According to Plaintiff, she made this alleged announcement during a meeting "scheduled by the senior vice president Leonard Zinnanti." Lawson Decl. Ex. A at 151:25-154:24.  Yet Plaintiff could not say for certain whether Boudreau even attended this meeting—only that she "believe[s] he did." *Id.* at 153:6-7.

And there certainly is no evidence of any <u>reaction</u> by President Boudreau to Plaintiff's alleged remarks about the prospect of initiating performance reviews for Mr. Rias.  Again, during her testimony, Plaintiff could not identify a single specific thing that President Boudreau said about Mr. Rias at any time.  Lawson Dec. Ex. A at 170:4-7; *see also id.* at 158:19-159:10 (Plaintiff does not recall President Boudreau saying anything to her about Mr. Rias's external discrimination complaint); Point I(A)(3), *supra* (citing additional testimony).

### B.  Plaintiff Cannot Base a Claim on the Other Alleged Workplace Slights

To the extent Plaintiff seeks to base her Section 1981 claim on the other alleged workplace slights she supposedly endured, that claim fails for all the reason set forth in Point I(B), *supra*.

### III.    THE NYCHRL RETALIATION CLAIM AGAINST PRESIDENT BOUDREAU SHOULD BE DISMISSED

The NYCHRL retaliation claim against President Boudreau is based on the same flawed retaliation theories that form the basis of the federal claims, and it fails for the same reasons.

While NYCHRL claims are subject to a more lenient standard in certain respects—and must therefore analyzed separately from their federal and state law counterparts—they are nonetheless

analyzed using a "similar framework," *Ya-Chen Chen*, 805 F.3d at 75-76. Moreover, the "NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Ballard v. Children's Aid Soc'y,* 781 F. Supp. 2d 198, 210 (S.D.N.Y. 2011). Thus, "[P]laintiff still bears the ultimate burden of establishing a *prima facie* case of retaliation" under the NYCHRL. *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 740 (2d Dep't 2013). And if the defendant thereafter offers legitimate reasons for its actions, the plaintiff must "either counter the defendant's evidence by producing evidence that the reasons put forth by the defendant were merely a pretext, or show that . . . the defendant was motivated at least in part by an impermissible motive." *Id.* at 741; *see also Ya-Chen Chen,* 805 F.3d at 76 (under the NYCHRL, plaintiff must show that challenged decision were "caused at least in part" by "retaliatory motives").

The NYCHRL's somewhat more lenient standard with respect to adverse employment actions, and the fact that NYCHRL claims are not subject to a "but-for" causation standard, do not compel a different result under City law. For example, while the NYCHRL does not require that the employer's action be "materially adverse" to the plaintiff, the action must nonetheless be "reasonably likely to deter a person from engaging in protected activity." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012) (citing N.Y.C. Admin. Code § 8–107(7)). With only one exception—Plaintiff's termination—the workplace slights in this case would not satisfy the federal or City adversity standard. *See, e.g., Ndongo v. Bank of China Ltd.,* No. 22-CV-05896, 2023 WL 2215261, at *7 (S.D.N.Y. Feb. 24, 2023) ("Even under the NYCHRL's 'relatively liberal standard,' 'petty slights or minor annoyances that often take place at work' are not actionable retaliation.") (quoting *Scott-Robinson v. City of New York*, No. 15-CV-09703, 2016 WL 7378775, at *5 (S.D.N.Y. Dec. 15, 2016)).

Similarly, while the NYCHRL does not require proof that retaliatory intent was the but-for cause of Plaintiff's termination, a plaintiff must still show that the challenged decision was "caused

at least in part" by retaliatory motives. *Ya-Chen Chen,* 805 F.3d at 76. As the analysis set forth above makes clear, Plaintiff's claims do not even satisfy this lower standard.

Finally, Plaintiff cannot salvage her NYCHRL claim by casting it as a purported "aiding and abetting" claim. *See* SAC ¶ 190. Here, the only potential actor that President Boudreau conceivably could have aided and abetted is CUNY, the only other defendant in this case. However, as set forth above, the claims against CUNY fail as a matter of law. Under the NYCHRL, there is "a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 253 (E.D.N.Y. 2015) (citing *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y.1999)). Given Plaintiff's failure to establish any claim for direct liability against any defendant, any claim for aiding and abetting necessarily fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in Defendants' favor and dismiss all of Plaintiff's remaining claims.

Dated:  New York, New York
        June 10, 2024

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

By:

/s/ Matthew J. Lawson
MATTHEW J. LAWSON
Assistant Attorney General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8733
matthew.lawson@ag.ny.gov