UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MICHELE A. BAPTISTE,

                 Plaintiff,

      -against-

THE CITY UNIVERSITY OF NEW YORK, and
VINCENT BOUDREAU, in his individual and
official capacity,

                Defendants.
------------------------------------------------------------X

Docket No:
1:22-cv-02785-JMF


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION FOR SUMMARY JUDGMENT</u>


JOSEPH & NORINSBERG, LLC

Jon L. Norinsberg, Esq.
Michael R. Minkoff, Esq.
110 East 59th Street, Suite 2300
New York, NY 10022

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS................................................................................................ 1

I.      Plaintiff's Employment Background. .............................................................. 1

II.     Plaintiff's Findings and Conclusions Against Boudreau Regarding Lynda Dodd ............. 2

III.    Boudreau Appointed as President, The Office of Civil Rights Investigations, and Boudreau's Deviation from His Practice of Evaluating Staff Performance. ..................... 3

        A.      Boudreau's installation as President and his "approach" to management. ............. 3

        B.      Boudreau never noted any of Plaintiff's "performance issues" after the OCR Investigations. ....................................................................... 3

IV.     Boudreau Begins Deviating from Standard Practices and Undermining Plaintiff's Work, Only to Switch Gears After Her Termination.................................... 4

V.      Lynda Dodd Files a Lawsuit Against CUNY and Boudreau ............................................. 5

VI.     Curtis Rias: Plaintiff's Advocacy and Opposition to Retaliation Lead to her Termination.................................................................... 6

VII.    Defendants' Shifting Justifications for Plaintiff's Termination.......................................... 7

STANDARD OF REVIEW ............................................................................................. 8

ARGUMENT................................................................................................................. 9

I.      DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S REHABILITATION ACT CLAIM........................................... 9

        A.      Plaintiff Theory Relating to Lynda Dodd Satisfies Her "*De Minimis*" *Prima Facie* Burden on Causation.................................................... 9

                1.      The close proximity between Dodd's federal action and Defendants' adverse actions against Plaintiff establish causation. ............................... 10

        B.      Defendants' Proffered Reasons for Plaintiff's Termination Are Pretext............. 12

i

1.      Defendants' failure to address any so-called "performance issues" during Plaintiff's employment make Defendants' reliance on them implausible. ............................................................................................. 13

2.      Defendants' departure from Boudreau's and the University's standard policies and practices provide additional evidence of pretext. ................. 16

3.      Boudreau's shifting justifications offered for Plaintiff's termination weaken Defendants' proffered nonretaliatory reasons for Plaintiff's termination. 17

    i.      *The PSC Union's meeting minutes are admissible evidence.* ........ *17*

    ii.     *Boudreau changes his justification for Plaintiff's termination twice.* ............................................................................................... *18*

C.      Ample Record Evidence Supports Plaintiff's Theory that Her Advocacy on Behalf of Curtis Rias Led Defendants to Retaliate. .......................................................... 19

D.      Plaintiff Presents Substantial Evidence of Pretext, Creating Disputed Issues of Material Fact Warranting Denial of Summary Judgment. ..................................... 21

II.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S SECTION 1981 CLAIM. ......................................................................... 22

III.  PLAINTIFF'S NEW YORK CITY HUMAN RIGHTS LAW CLAIMS EVEN MORE EASILY WITHSTAND SUMMARY JUDGMENT. ...................................................... 24

**CONCLUSION** ................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................... 19

*Anderson v. Rochester-Genesee Regional Transp. Auth.*,
  337 F.3d 201 (2d Cir. 2003).................................................................................... 11

*Baker v. MTA Bus. Co.*,
  2023 U.S. Dist. LEXIS 133710, 2023 WL 4896686 (S.D.N.Y. Aug. 1, 2023)....................... 24

*Brady v. Town of Colchester*,
  863 F.2d 205 (2d Cir. 1988)...................................................................................... 8

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................... 8

*Chen v. Triumph Engine Control Sys.*,
  2023 U.S. Dist. LEXIS 54792 (D. Conn. Mar. 30, 2023)........................................... 14

*De Figueroa v. N.Y. State, State Univ.*,
  2022 U.S. Dist. LEXIS 162273 (E.D.N.Y. Sep. 8, 2022)........................................... 10

*Dodd v. City Univ. of N.Y.*,
  489 F. Supp. 32, 219 (S.D.N.Y. 2020) ...................................................................... 17

*Duplan v. City of New York*,
  888 F.3d 612 (2d Cir. 2018)...................................................................................... 13

*Edelman v. NYU Langone Health Sys.*,
  2022 WL 4537972, 2022 U.S. Dist. LEXIS 176681 (S.D.N.Y. Sep. 28, 2022).......... 13, 14, 15

*Fernandez v. City of New York*,
  2020 WL 4605238 (S.D.N.Y. Aug. 11, 2020)........................................................... 8

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
  391 U.S. 253 (1968).................................................................................................... 9

*Glob. Network Commc'ns, Inc. v. City of New York*,
  458 F.3d 150 (2d Cir. 2006)...................................................................................... 11

*Goonewardena v. N.Y. State Workers' Comp. Bd.*,
788 F. App'x 779 (2d Cir. 2019) ......................................................................... 13

*Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*,
252 F.3d 545 (2d Cir. 2001) ................................................................................ 10

*Hayes v. Dahlke*,
976 F.3d 259 (2d Cir. 2020) ................................................................................ 10

*Joseph v. Owens & Minor Distrib.*,
5 F. Supp. 3d 295 (E.D.N.Y. 2014) ..................................................................... 25

*Kwan v. Andalex Grp., LLC*,
737 F.3d 834 (2d Cir. 2013) ................................................................... 14, 17, 21

*Lifranc v. N.Y.C. Dep't of Educ.*,
2010 U.S. Dist. LEXIS 34009 (E.D.N.Y. Apr. 6, 2010) ...................................... 14

*Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*,
703 F. Supp. 2d 230 (E.D.N.Y. 2010). ................................................................ 13

*Natofsky v. City of New York*,
921 F.3d 337 (2d. Cir. 2019) ............................................................................... 10

*Ndongo v. Bank of China Ltd.*,
2023 U.S. Dist. LEXIS 31238 (S.D.N.Y. Feb. 24, 2023) ..................................... 24

*Nespresso USA, Inc. v. Peet's Coffee, Inc.*,
2023 U.S. Dist. LEXIS 12228 (S.D.N.Y. Jan. 24, 2023) ...................................... 11

*Phillips v. Bowen*,
278 F.3d 103 (2d Cir. 2002) ................................................................................ 23

*Piligian v. Icahn Sch. of Med. at Mount Sinai*,
490 F. Supp. 3d 707 (S.D.N.Y. 2020) ................................................................... 9

*Prior v. Glass Am. Midwest, LLC*,
2023 U.S. Dist. LEXIS 148954 (D. Conn. Aug. 24, 2023) .............................. 15, 16

*Richardson v. N.Y. State Dep't of Corr. Serv.*,
180 F.3d 426 (2d Cir. 1999) ................................................................................ 11

*Rios v. Dep't of Educ.*,
351 Fed. App'x 503 (2d Cir. 2009) ........................................................................ 9

*Rodrigues v. Conn. Container Corp.*,
    2022 U.S. Dist. LEXIS 50641, 2022 WL 844610 (D. Conn. Mar. 22, 2022) ......................... 16

*Rolon v. Ward*,
    345 F. App'x 608 (2d Cir. 2009) ................................................................................................. 23

*Rubin v. ADT, LLC*,
    2019 U.S. Dist. LEXIS 155760, 2019 WL 4366545 (D. Conn. Sept. 12, 2019) ............... 14, 19

*Scé v. City of N.Y.*,
    2022 U.S. App. LEXIS 5352 (2d Cir. Mar. 1, 2022) ................................................................ 11

*Scott-Robinson v. City of New York*,
    2016 U.S. Dist. LEXIS 177789, 2016 WL 7378775 (S.D.N.Y. Dec. 15, 2016) ..................... 24

*Treglia v. Town of Manlius*,
    313 F.3d 713 (2d Cir. 2002) ........................................................................................................ 9

*United States v. Pirk*,
    2018 U.S. Dist. LEXIS 52235 (W.D.N.Y. Mar. 28, 2018) ...................................................... 18

*Uttarwar v. Lazard Asset Mgmt. LLC*,
    2024 U.S. Dist. LEXIS 51499 (S.D.N.Y. Mar. 22, 2024) ........................................................ 24

*Vogel v. CA Inc.*,
    662 F. App'x 72 (2d Cir. 2016) .................................................................................................. 11

*Weyant v. Okst*,
    101 F.3d 845 (2d Cir. 1996) ........................................................................................................ 8

*Williams v. Regus Mgmt. Grp., LLC*,
    836 F. Supp. 2d 159 (S.D.N.Y. 2011) ...................................................................................... 25

**Rules**                                                                                         **Page(s)**

Fed. R. Civ. P. 56(a) ..................................................................................................................... 8

Fed. R. Ev. 201(b) ....................................................................................................................... 11

## PRELIMINARY STATEMENT

Plaintiff Michele Baptiste opposes Defendants The City University of New York ("CUNY") and Vincent Boudreau ("Boudreau") (collectively, "Defendants")' motion for summary judgment. The record evidence demonstrates that Defendants retaliated against Plaintiff by terminating her employment in response to her opposition to discrimination and retaliation against Professor Lynda Dodd and staff member Curtis Rias, collectively violating the Americans with Disabilities Act ("ADA") as amended by the Rehabilitation Act and, Section 1981, and the New York City Human Rights Law ("NYCHRL"). Plaintiff easily establishes her *prima facie* case by pointing to adverse actions that occurred in close temporal proximity to protected activity, leading to Defendants' decision to terminate her. And while Defendants offer what they claim to be their "legitimate" reasons for undertaking their adverse actions, the record evidence plainly demonstrates that those justifications were mere pretext for Defendant Boudreau's animus towards Plaintiff in response to her repeated advocacy against discrimination and retaliation.

When viewed in the light most favorable to Plaintiff, the inherent "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendants' shifting justifications for their decision to terminate Plaintiff's employment would lead a reasonable jury to conclude that Defendants retaliated against her. As a result, the Court should deny Defendants' motion.

## STATEMENT OF FACTS

### I.    Plaintiff's Employment Background.

Plaintiff Michele Baptiste ("Plaintiff") worked for City College ("the University") - - one of the universities within the CUNY system - - from June 2013 until April 26, 2018, as the Dean of Diversity, Compliance, and Faculty Relations ("Dean of Diversity"). Defs.' R. 56.1 Statement, Dkt. No. 65 [hereinafter "Dkt. No. 65"], ¶ 2. As Dean of Diversity at City College, Plaintiff served

as the head of City College's Office of Diversity and Compliance (the "Diversity Office").  Dkt. No. 65, ¶ 8. Amon several other duties and responsibilities, Plaintiff and the Diversity Office were charged with investigating internal complaints at City College, alleging discrimination based on race, ethnicity, gender and disability status, as well as complaints of sexual misconduct. Dkt. No. 65, ¶ 10. Plaintiff and the Diversity Office typically received an average of between five and ten complaints per month. Pl.'s R. 56.1(b) Counterstatement of Material Facts [hereinafter "Pl.'s Cntr.S."], ¶ 99. The President of City College oversees, controls, and allocates all funding for the Diversity Office, including the budget for hiring and scheduling staff. Pl.'s Cntr.S., ¶ 9, ¶ 109.

During the early stages of her tenure, Plaintiff worked under then-President Lisa Coico (Frances). Dkt. No. 65, ¶ 17. Throughout President Coico's tenure, Plaintiff never received any verbal or written discipline regarding her job performance, including no complaints or disciplinary issues relating to her manner, method, or effectiveness in handling, investigating, or responding to complaints. Pl.'s Cntr.S., ¶ 132.

## II.    <u>Plaintiff's Findings and Conclusions Against Boudreau Regarding Lynda Dodd</u>

In or about March 2015, Professor Lynda Dodd - - Associate Professor at City College - - lodged a complaint against her supervisor, Bruce Cronin, and Defendant Boudreau, who at the time oversaw Professor Dodd's department as the Dean of the Colin Powell School at City College. Dkt. No. 65, ¶ 14. Plaintiff was tasked with investigating Professor Dodd's complaint. Dkt. No. 65, ¶ 15. As a result of Plaintiff's investigation, she issued formal findings and conclusions that recommended Bruce Cronin be removed from his position, and the Defendant Boudreau be reprimanded for his role in retaliation against Professor Dodd. Dkt. No. 65, ¶¶ 15-23. Defendant Boudreau was informed of this conclusion and recommendation at the time it was made - - both during a meeting with then-President Coico and by reviewing the written memorandum that

Plaintiff prepared making these recommendations. Pl.'s Cntr.S., ¶¶ 25, 83-85. As a result of Plaintiff's efforts, this was the only time Boudreau ever received a disciplinary write-up throughout his tenure. Pl.'s Cntr.S., ¶ 85.

### III.    Boudreau Appointed as President, The Office of Civil Rights Investigations, and Boudreau's Deviation from His Practice of Evaluating Staff Performance.

#### A.    Boudreau's installation as President and his "approach" to management.

After Coico was forced to step down by CUNY Chancellor Milliken, Boudreau was appointed President in her stead in November 2016. Pl.'s Cntr.S., ¶¶ 26-28. As President, Boudreau was responsible for, and controlled, the budget of the Diversity Office, including funding for Plaintiff's staff. Pl.'s Cntr.S., ¶ 109. President Boudreau's "approach to managing a complex organization" was to "evaluate" his staff, and when they were not performing up to Boudreau's expectations after those evaluations, Boudreau would "move them out of the position if they are [] not able to fulfill the responsibilities that [he had] have given to them." Pl.'s Cntr.S., ¶ 145.

Upon assuming the role as President, Boudreau met with Plaintiff on a monthly basis. Pl.'s Cntr.S., ¶ 110. During these monthly meetings, Boudreau provided Plaintiff with guidance and feedback on Plaintiff's responsibilities and ongoing investigations. Pl.'s Cntr.S., ¶ 137. This was, in fact, consistent with the University's formal policy: for the President to meet with Plaintiff to review Office of Diversity investigations on a monthly or regular basis. Pl.'s Cntr.S., ¶ 138.

#### B.    Boudreau never noted any of Plaintiff's "performance issues" after the OCR Investigations.

Around the time he was appointed, Boudreau learned that the United States Department of Education's Office of Civil Rights ("OCR") was conducting an investigation in response to two specific complaints out of the hundreds of complaints that Plaintiff and the Office of Diversity handled over the course of Plaintiff's tenure ("the First OCR Investigation"). Pl.'s Cntr.S., ¶¶ 93-

95. The First OCR Investigation resulted in findings that one of the investigators in the Office of Diversity, LaWanda Isreal Williams, failed to timely conclude her investigation into the "first complaint." Pl.'s Cntr.S., ¶¶ 37, 45. OCR Issued this conclusion after the First OCR Investigation, while also noting Ms. Isreal lacked the resources necessary to handle the investigation in a speedier manner. Pl.'s Cntr.S., ¶¶ 37, 45.

OCR's report also reached the conclusion that Plaintiff handled a "second complaint's" investigation too slowly. Pl.'s Cntr.S., ¶¶ 37, 45, 94-97. But In reaching its conclusion, OCR failed to take into consideration Plaintiff's reasoning for the length of time it took her to complete the investigation, including: that the "second complainant's" allegations led Plaintiff to ascertain that the second complainant in fact undertook a consensual romantic relationship with the person they had accused as an alleged sexual harasser; and that the alleged harasser was no longer an employee of the University, making it difficult to interview them as part of Plaintiff's investigation. Pl.'s Cntr.S., ¶¶ 37, 45, 94-97. Ultimately, Defendant Boudreau agreed with Plaintiff's view in response to, and at the time of, OCR issuing its findings. Pl.'s Cntr.S., ¶ 147

## IV. Boudreau Begins Deviating from Standard Practices and Undermining Plaintiff's Work, Only to Switch Gears After Her Termination.

Defendant Boudreau was President when the First OCR Investigation concluded. Pl.'s Cntr.S., ¶¶ 93-97. Boudreau met with Plaintiff to discuss the findings of the First OCR Investigation, and to discuss ways that they - - together - - "can improve the work of the office." Pl.'s Cntr.S. ¶ 100. But Boudreau never identified any performance issues with Plaintiff, nor indicated to her in any way that he was unhappy with her performance, never issuing her any formal or informal discipline, performance reviews, or evaluations. Pl.'s Cntr.S., ¶¶ 100-102, 133-137. Indeed, CUNY formally represented to OCR that as part of Plaintiff's and the University's follow-up under CUNY's resolution agreement with OCR, "all but one of the investigations has

4

[sic] been completed," and that this single incomplete investigation was delayed due to the target's pending criminal charges, which prohibited Plaintiff from completing the investigation on advice of the target's counsel - - and which Plaintiff later completed. Pl.'s Cntr.S., ¶¶ 56, 96-97.

When Plaintiff met with Boudreau to discuss how they could improve the work of Plaintiff's office, Plaintiff requested resources for additional investigators because she "had concerns about resources being allocated to the office." Pl.'s Cntr.S., ¶ 102. But rather than grant Plaintiff's request, Boudreau discontinued his monthly meetings with Plaintiff. Pl.'s Cntr.S., ¶¶ 110-112. Boudreau re-instituted these monthly meetings - - consistent with University policy - - only *after* he terminated Plaintiff. Pl.'s Cntr.S., ¶ 138.

Moreover, the work hours for Plaintiff's lead investigator, LaWanda Isreal Williams, were cut under Boudreau's administration from three days to one day per week, compared to former President Lisa Coico's administration - - *despite* Plaintiff requesting additional resources following OCR's findings. Pl.'s Cntr.S., ¶¶ 114-120. The justification for Plaintiff's request were obvious; even her successor noted how she "could not fathom how [Plaintiff's] office could function without and [sic] investigator working at least 3 days per week." Pl.'s Cntr.S., ¶¶ 117-120.

## V.    Lynda Dodd Files a Lawsuit Against CUNY and Boudreau

On December 20, 2017, Professor Dodd filed a lawsuit ("the *Dodd* Action"), which restated the history of Dodd's requests for accommodations, her appeals, her allegations against Defendant Boudreau in conjunction with Dodd's requests, complaints, and appeals, specifically including Plaintiff Baptiste's findings against Boudreau, noting that "Baptiste recommended . . . that Boudreau be given a 'letter of discipline.'" Pl.'s Cntr.S., ¶ 84. On March 28, 2018, Professor Dodd filed an Amended Complaint in the *Dodd* Action, which included additional complaints Dodd discussed with Baptiste against Boudreau, and included a letter of recommendation in support of

Dodd that referred to Defendants' decision to deny her tenure as a "manifest injustice." Pl.'s Cntr.S., ¶ 88. On April 12, 2018 - - merely two weeks before Defendant Boudreau terminated Plaintiff's employment - - an initial conference was held in the *Dodd* Action. Pl.'s Cntr.S., ¶ 89.

Because of the *Dodd* Action's filing, Plaintiff was forced to discontinue an internal investigation into allegations Dodd had raised against Professor Vivien Tartter, consistent with the standard practice at the University which was communicated to Plaintiff throughout her tenure. Pl.'s Cntr.S., ¶¶ 103-108.

## VI. Curtis Rias: Plaintiff's Advocacy and Opposition to Retaliation Lead to her Termination.

Plaintiff also advocated on behalf of Curtis Rias, a long-term CUNY employee who complained about discrimination and retaliation against him due to his race, ethnicity, disability, and sexual orientation. Pl.'s Cntr.S., ¶¶ 121-123. At least as early as October 27, 2017, Mr. Rias sought Plaintiff's assistance to file a request to accommodate his disability after he experienced retaliation for filing an external complaint with the EEOC. Pl.'s Cntr.S., ¶ 121. CUNY's Human Resources Department denied Mr. Rias's accommodation request in January 2018. Pl.'s Cntr.S., ¶ 75. When Mr. Rias appealed that denial to Plaintiff, Plaintiff was prepared to grant his request. Pl.'s Cntr.S., ¶ 81. Before getting the chance to do so, however, approximately two weeks before her termination Plaintiff met with several individuals during a meeting organized by Leonard Zinetti, Senior Vice President of the Office of Facilities, and attended by Defendant Boudreau ("the Zinetti Meeting"). Pl.'s Cntr.S., ¶¶ 123-131.

Other than Plaintiff herself, all attendees at the Zinetti Meeting - - *including Boudreau* - - viewed "Curtis . . . as a troublemaker" after he "filed an external complaint." Pl.'s Cntr.S., ¶ 130. Plaintiff observed how Boudreau himself was "outrage[d] that . . . Curtis had filed an external complaint" and that as a result, Boudreau and the rest of the attendees expressed their desire to

start conducting performance evaluations of Curtis Rias in an attempt to "make him uncomfortable" because Boudreau and other attendees expressed their belief that Mr. Rias "was not really disabled. He was just filing these complaints and that we shouldn't take it seriously." Pl.'s Cntr.S., ¶¶ 125-130. Mr. Rias had never received a single performance evaluation in his twenty years as a CUNY employee. Pl.'s Cntr.S., ¶ 127. As a result, Plaintiff complained objected during the Zinetti meeting that commencing performance evaluations of Curtis Rias now – for the first time, after his complaints – would be viewed as retaliation. Pl.'s Cntr.S., ¶ 128. Plaintiff "was the only person" who was trying to dissuade Boudreau and the group of attendees from the notion that CUNY "should start evaluating an employee who had never been evaluated before . . . in light of his external complaint [because] the timing of it looks like retaliation. Pl.'s Cntr.S., ¶ 131.

## VII.    **Defendants' Shifting Justifications for Plaintiff's Termination.**

Approximately two weeks after both the initial conference in the *Dodd* Action and the Zinetti Meeting, Boudreau terminated Plaintiff's employment. Pl.'s Cntr.S., ¶ 69. When terminating Plaintiff, Boudreau did not give her any specific justification for his decision. Pl.'s Cntr.S., ¶ 139. During Plaintiff's employment, Defendant Boudreau never disciplined Plaintiff, gave her any performance evaluations, informed her that he was "displeased with her work," or otherwise gave any indication that he wished to "reform" any of her work or habits. Pl.'s Cntr.S., ¶¶ 132-138.

The same day he terminated Plaintiff's employment, Boudreau announced during a CUNY Professional Staff Congress ("PSC") Labor-Management union meeting that "the resources of the Office of Affirmative Action, Compliance, and Diversity" - - i.e., Plaintiff's office - - "have been cut" with PSC noting in its minutes that as a result, "[t]oday [Boudreau] has fired the director," which was Planitiff. Pl.'s Cntr.S., ¶ 140. Just over two weeks later, on May 2, 2018, Defendant

Boudreau circulated an email to CUNY faculty announcing that he terminated Plaintiff's employment because of his decision to effectuate a "change in leadership," making no mention of any performance issues and thanking Plaintiff for her service "for the past several years." Pl.'s Cntr.S., ¶ 141. That very same day, and contradicting Boudreau's statement to the PSC two weeks earlier, Boudreau gave a $12,000.00 raise to Jennifer Light, who was already working for Boudreau at City College. Pl.'s Cntr.S., ¶ 142. Boudreau also agreed to hire an additional investigator at Ms. Light's request, Diana Cuozzo, and accepted Ms. Light's recommendation to increase the budgeted hours for the existing investigator, LaWanda Isreal Williams, from one day to three days per week. Pl.'s Cntr.S., ¶¶ 117-120. It was not until after Plaintiff filed her discrimination complaint against Defendants in the New York State Division of Human Rights that Defendants - - for the very first time - - changed their position, now claiming that the decision to terminate Plaintiff's employment was due to her performance. Pl.'s Cntr.S., ¶ 143.

## STANDARD OF REVIEW

Summary judgment is only appropriate when the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Fernandez v. City of New York*, 2020 WL 4605238, at *3 (S.D.N.Y. Aug. 11, 2020); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a summary judgment motion, "the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) "[A]ll doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir. 1988). The nonmoving party need only present "evidence supporting the claimed factual dispute be shown to require a

jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-90 (1968). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## ARGUMENT

### I. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S REHABILITATION ACT CLAIM.

Defendants argue that Plaintiff's retaliation claim under the Rehabilitation Act fails because she cannot establish causation in her *prima facie* case relating to Professor Dodd. Dkt. No. 64, Defs.' Mem., at 17. And that even if Plaintiff can establish her *prima facie* case, Plaintiff cannot show that Defendants' proffered reason for her termination was pretext -- whether based Plaintiff's claims relating to Professor Dodd or Cutis Rias. Dkt. No. 64, Defs.' Mem., at 19-20, 22-23. The record evidence reveals that Defendants are mistaken; their motion should be denied.

First, regarding Plaintiff's theory as to Professor Dodd: Defendants ignore critical links in the chain leading up to Plaintiff's termination. Second, Defendants misrepresent the record evidence and ask this Court to disregard how Defendants' shifting justification for Plaintiff's termination, coupled with Defendant Boudreau's departures from his and the University's formal practices and policies during Plaintiff's employment only to shift gears and adhere to them after terminating Plaintiff, could lead a jury to conclude Defendants retaliated.

### A. Plaintiff Theory Relating to Lynda Dodd Satisfies Her "*De Minimis*" *Prima Facie* Burden on Causation.

Plaintiff's *McDonnell Douglas* burden to establish her *prima facie* case is "de minimis." *E.g., Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 718 (S.D.N.Y. 2020) (citing *Rios v. Dep't of Educ.*, 351 Fed. App'x 503, 505 (2d Cir. 2009)). Relevant to this motion,

Plaintiff can establish a causal connection between her protected activity and Defendants' adverse employment action *either* "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *De Figueroa v. N.Y. State, State Univ.*, 2022 U.S. Dist. LEXIS 162273, at *12 (E.D.N.Y. Sep. 8, 2022) (citing *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d. Cir. 2019)).

The Second Circuit "has fastidiously avoided drawing a 'bright line' defining the outer limits 'beyond which a temporal relationship is too attenuated to establish [causation].'" *De Figueroa*, 2022 U.S. Dist. LEXIS 162273, at *19-20 (quoting *Hayes v. Dahlke*, 976 F.3d 259, 273 (2d Cir. 2020)). But courts consistently find that "four months" between a protected activity and an adverse employment action "is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion." *De Figueroa*, 2022 U.S. Dist. LEXIS 162273, at *20 (citing *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).

### 1. *The close proximity between Dodd's federal action and Defendants' adverse actions against Plaintiff establish causation.*

Defendants' brief relies on a claimed lack of direct evidence of retaliation, noting how "Plaintiff could recall only one conversation with Boudreau about her findings in the Lynda Dodd matter." Dkt. No. 64, Defs.' Mem., at 19. But going a step too far, Defendants erroneously argue how "[t]he lengthy gap between protected activity (in 2015) and adverse action (in 2018) defeats any showing of temporal proximity." Dkt. No. 64, Defs.' Mem., at 17. In so doing, Defendants ignore the flurry of activity in Professor Dodd's lawsuit before Plaintiff's retaliatory termination.

Specifically, prior to Professor Dodd's federal action, Defendant Boudreau met with Plaintiff from time to time up until December 2017 as part of her normal job duties. Pl.'s Cntr.S., ¶¶ 110-112. Things changed, however, after Professor Dodd filed a lawsuit on December 20, 2017, in the U.S. District Court for the Southern District of New York against the same Defendants herein (as well as other named individual defendants) (the "*Dodd* Action"). Pl.'s Cntr.S., ¶¶ 86-89. Modifying the adage "revenge is a dish best served cold," the *Dodd* Action "reheated" the animus caused when Plaintiff previously found Boudreau retaliated against Dodd, enflaming Boudreau's retaliatory animus towards Plaintiff herself. Indeed, the *Dodd* Action reopened old wounds by restating the history of Dodd's allegations against Defendant Boudreau and by specifically including Plaintiff's findings *against* Boudreau plus additional examples of Plaintiff's ongoing advocacy on behalf of Professor Dodd. Pl.'s Cntr.S., ¶¶ 86-89.[1]

As the Second Circuit has observed, when considering the temporal proximity "clock," a district court should not limit itself in considering the "type of event that might prompt actionable retaliation," noting that how a plaintiff can establish a *prima facie* case where actions occurred shortly after proceedings in a litigated matter. *See Scé v. City of N.Y.*, 2022 U.S. App. LEXIS 5352, at *9 (2d Cir. Mar. 1, 2022) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 447 (2d Cir. 1999)). To that end, the Second Circuit has also held that implementing negative changes to a plaintiff's work schedule is in and of itself an adverse employment action sufficient to support a retaliation claim. *See Vogel v. CA Inc.*, 662 F. App'x 72, 76 (2d Cir. 2016) (finding

---

[1] The Court may take judicial notice of prior litigation involving the Defendants, *Anderson v. Rochester-Genesee Regional Transp. Auth.*, 337 F.3d 201, 205 n.4 (2d Cir. 2003) (citing Fed. R. Ev. 201(b)). Because Plaintiff points to excerpts from the *Dodd* Action's complaints to establish the fact and timing of the litigation, *Nespresso USA, Inc. v. Peet's Coffee, Inc.*, 2023 U.S. Dist. LEXIS 12228, at *11 (S.D.N.Y. Jan. 24, 2023) (citing *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)), the Court may utilize this information at the summary judgment stage. *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 839 (2d Cir. 1992).

changes to work schedule "harmful to the point that it could well dissuade a reasonable worker from continuing to complain.").

That is precisely the impact that the *Dodd* Action had on Defendants. After its filing, Boudreau formally met directly with Plaintiff ***only one final time*** on January 11, 2018. Pl.'s Cntr.S., ¶ 114. Moreover, Defendants were reminded several additional times *after* the *Dodd* Action's initial filing of Plaintiff's ongoing advocacy in support of Dodd - - up until a mere two weeks before Plaintiff's termination. Pl.'s Cntr.S., ¶ 88. This is consistent with Plaintiff's theory and the allegations in her Amended Complaint that the *Dodd* Action reopened old wounds from Boudreau's perspective, dating back to Plaintiff's original advocacy on behalf of Professor Dodd, and triggering his desire to terminate Plaintiff's employment once and for all.

Defendants' motion relies exclusively on Plaintiff's 2015 findings in arguing against her *prima facie* case. But the close temporal proximity between the *Dodd* Action and Defendants' adverse actions against Plaintiff caused negative changes to Plaintiff's schedule by removing her meetings with Defendant Boudreau, and, soon thereafter terminating her employment. These materially adverse actions satisfy Plaintiff's *prima facie* burden on causation. Accordingly, the Court should reject Defendants' argument and proceed to *McDonnell Douglas*'s next phase.

### B.    Defendants' Proffered Reasons for Plaintiff's Termination Are Pretext.

Understanding that Plaintiff's *prima facie* case is easily established, Defendants next argue that Plaintiff cannot rebut Defendants' proffered justification for terminating Plaintiff's employment, claiming that "the evidence overwhelmingly shows that Plaintiff was terminated for poor performance." Dkt. No. 64, Defs.' Mem., at 20. To that end, Defendants place considerable weight on the United States Department of Education's Office of Civil Rights ("OCR") findings dated February 16, 2017, and October 16, 2017, as well as subsequent events regarding Professor

Dodd's complaint against Vivien Tartter. *Id*. Defendants even argue that because Boudreau could have fired Plaintiff when he became President but did not do so at the time, this undercuts Plaintiff's Dodd theory. *Id*. at 19. But Defendants overstate the significance of their so-called "evidence," and improvidently ignore the record evidence contradicting their proffered justification.

Specifically, Defendants' own admissions that Boudreau deviated from both his own standard practices and formal University policy during Plaintiff's employment. He never addressed any of Plaintiff's so-called "poor performance" issues before her termination. These facts, coupled with Defendants' shifting and swift reversal of their real-time rationale for Plaintiff's termination, provide more than enough evidence for a reasonable jury to conclude that - - regardless of whether Defendants' "performance-based justification . . . is accurate or fair," Plaintiff's evidence shows "that it was not the actual justification" for Boudreau's decision to terminate her employment. *Id*. at 21 (citing *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010)).

### 1. *Defendants' failure to address any so-called "performance issues" during Plaintiff's employment make Defendants' reliance on them implausible.*

As the Second Circuit has held, an employer's view of an employee's performance, "and not the accuracy of that view, is the proper focus of the pretext" inquiry. *Goonewardena v. N.Y. State Workers' Comp. Bd.*, 788 F. App'x 779, 782 (2d Cir. 2019). To that end, even if a plaintiff "truly had performance issues" a Plaintiff's protected activity could be the "but-for cause of her firing, because [the conduct] is the reason Defendants took notice and used those [performance] issues against her." *Edelman v. NYU Langone Health Sys.*, 2022 WL 4537972, 2022 U.S. Dist. LEXIS 176681, at *36-37 (S.D.N.Y. Sep. 28, 2022) (citing *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)) (observing that because "Defendants apparently did not compile lists of

her faults before Plaintiff complained of discrimination" could convince a jury that Defendants' "retaliatory intent was a but-for cause of Plaintiff's termination."). Indeed, it is well-settled that "but-for causation does not require proof that retaliation was the *only* cause of the employer's action, but only that the adverse action would not have occurred *in the absence of the retaliatory motive*." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (emphasis added).

Here, Defendants misrepresent that Plaintiff's alleged "poor performance" was the actual "view" or justification relied upon at the time Boudreau terminated her employment, pointing specifically to the OCR's two findings and suggesting that Plaintiff neglected to follow up when Professor Dodd filed an internal complaint against Professor Tartter. Dkt. No. 64, Defs.' Mem., at 13, 20. But just like in *Edelman*, 2022 WL 4537972, 2022 U.S. Dist. LEXIS 176681, at *36-37, there is no evidence that Defendants ever took issue with Plaintiff's performance *during* her employment. This deafening silence demonstrates strong evidence the Defendants' proffered justification is pretext.

Boudreau admits that he never addressed any of these apparent deficiencies with Plaintiff while she was employed. Pl.'s Cntr.S., ¶¶ 100-102. As one court has explained, a defendant's action of "deviat[ing] from its standard practice" regarding providing employee feedback can amount to "a textbook case for the jury to decide." *See Chen v. Triumph Engine Control Sys.*, 2023 U.S. Dist. LEXIS 54792, at *34-35 (D. Conn. Mar. 30, 2023) (citing *Rubin v. ADT, LLC*, 2019 U.S. Dist. LEXIS 155760, 2019 WL 4366545, at *7 (D. Conn. Sept. 12, 2019)); *Lifranc v. N.Y.C. Dep't of Educ.*, 2010 U.S. Dist. LEXIS 34009, at *41 (E.D.N.Y. Apr. 6, 2010) (observing how "deviations from standard practice" may raise questions of good faith and support an inference of pretext"). Boudreau himself admitted during his deposition that he deviated from his standard practice in managing a "complex organization" where, in the normal course, he evaluates his staff

14

if he believes they are underperforming, but that he "never evaluated" Plaintiff at all. Pl.'s Cntr.S., ¶¶ 145-146. To that end, Boudreau's admission that he never issued any performance reviews or performance-related warnings to Plaintiff despite Defendants' claims *during* litigation about her alleged poor performance represents clear pretext. This could easily lead a jury to determine that Defendants' true motivation for terminating Plaintiff was retaliation. *Edelman*, 2022 WL 4537972, 2022 U.S. Dist. LEXIS 176681, at *36-37; *see also Prior v. Glass Am. Midwest, LLC*, 2023 U.S. Dist. LEXIS 148954, at *18 (D. Conn. Aug. 24, 2023) (noting abandonment of "procedural regularity" without basis or notice is evidence of pretext).

Additionally, Defendants' suggests regarding Boudreau's decision *not* to fire Plaintiff when he first became President is pure sophistry. Defendants could not have realistically terminated Plaintiff when Boudreau became President, as he relied upon her to complete additional follow-up work after OCR issued its first findings, and he even *agreed* with Plaintiff's approach at the time. Pl.'s Cntr.S., ¶¶ 95-97, 147. Moreover, if Defendant terminated Plaintiff when he first became President, that would have clearly demonstrated his retaliatory animus. Instead, Boudreau systematically undermined Plaintiff's job to later paint her as a poor performer. Boudreau admitted that his only means of reviewing Plaintiff's work was during his monthly meetings, Pl.'s Cntr.S., ¶ 137, which he discontinued at least as early as June 2017, Pl.'s Cntr.S., ¶ 104. That he completely stopped meeting with Plaintiff after the *Dodd* Action was commenced, Pl.'s Cntr.S., ¶¶ 86, 114, further demonstrates his retaliatory animus toward Plaintiff, proving how his failure to identify any performance issues *during* plaintiff's employment renders Defendants' now convenient *post hoc* explanation implausible. Going even further, Plaintiff testified about how Boudreau agreed with *Plaintiff's* assessment of the First OCR Investigation's findings in 2017, Pl.'s Cntr.S., ¶ 147, which directly contradicts Defendants' position in litigation - - strongly demonstrating pretext.

### 2. *Defendants' departure from Boudreau's and the University's standard policies and practices provide additional evidence of pretext.*

Making matters even worse, Boudreau also admitted that during Plaintiff's employment, he deviated not only from his *own* practices, but also from *the University's* actual policy for the President to monitor the progress of Diversity Office investigations, only to later *adhere* to that policy *after* he terminated Plaintiff's employment. Pl.'s Cntr.S., ¶¶ 137-138. This is significant, as an employer's departure from a formal policy can be evidence of pretext. *See, e.g., Prior*, 2023 U.S. Dist. LEXIS 148954, at *17-18 (citing *Rodrigues v. Conn. Container Corp.*, 2022 U.S. Dist. LEXIS 50641, 2022 WL 844610, at *6 (D. Conn. Mar. 22, 2022) (noting abandonment of formal policies "without basis or notice" could serve as adequate proof of pretext). What is more, Defendants *blamed* Plaintiff for *adhering* to longstanding policies and practices that required her to discontinue internal investigations when a complainant or respond is a plaintiff or defendant in an *external* proceeding, while permitting Plaintiff's *successor* to follow that policy. Pl.'s Cntr.S., ¶¶ 106-108. This contradicts and strongly undermines Defendants' argument that Plaintiff's response to the Dodd complaint against Vivien Tartter was in any way an "additional performance lapse[]." Dkt. No. 64, Defs.' Mem., at 13.

Viewing the facts in the light most favorable to Plaintiff, a rational juror could conclude how pretext is manifest based on the voluminous record evidence. Boudreau departed from the University's formal policy when he was meant to be supervising Plaintiff. He failed to advise Plaintiff of any performance issues during her tenure, while actually *agreeing* with Plaintiff's work at the time. After terminating Plaintiff, Boudreau reinstitute the very policy that would have assisted Plaintiff when attempting to perform her job. That Defendants also *blame* Plaintiff for *following* proper protocols further weakens Defendants' argument, demonstrating how retaliation was in fact the but-for cause of Defendants' decision to terminate Plaintiff's employment.

> ### 3. *Boudreau's shifting justifications offered for Plaintiff's termination weaken Defendants' proffered nonretaliatory reasons for Plaintiff's <u>termination.</u>*

Plaintiff further demonstrates pretext by presenting admissible record evidence establishing that Defendants have provided at least three separate contradictory explanations for their decision to terminate Plaintiff's employment, presenting strong evidence of pretext by weakening the plausibility of, and directly contradicting, Defendants' "performance"-based proffer for her termination. *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 32, 219, 247-48 (S.D.N.Y. 2020) (citing *Kwan*, 737 F.3d a 846). That is, immediately after and indeed on the same day as her termination, Defendant Boudreau expressed to a meeting of the CUNY Professional Staff Congress ("PSC"), the labor union that represents CUNY faculty and staff, that he was forced to terminate Plaintiff's employment due to cuts to "the resources of the Office of Affirmative Action, Compliance, and Diversity."  Pl.'s Cntr.S., ¶ 140.

> ### i. <u>The PSC Union's meeting minutes are admissible evidence.</u>

Defendants ask this Court to ignore this strong evidence of pretext by erroneously claiming that the PSC's meeting minutes, memorializing Boudreau's statement, is somehow "inadmissible hearsay." But Defendants' conclusory argument can be easily cast aside, as the minutes represent a paradigmatic example of the business record exception to hearsay under Rule 803(6). Indeed, Defendants themselves were so confident in the veracity and accuracy of the PSC's meeting minutes as a general matter, that CUNY's General Counsel, Paul Occhiogrosso, emphasized his trust in PSC's own ability to create their minutes, declining PSC's offer to review and revise the minutes and emphasizing instead that "the PSC should be free to issue its own minutes based on its understanding of what [was] discussed at the meeting[s]." Pl.'s Cntr.S., ¶ 113. Defendants cannot now disclaim the confidence CUNY's own General Counsel - - whose prior admission in

the record acknowledge the sufficiency of PSC's procedures for preparing and issuing its meeting minutes - - expressed the accuracy and reliability of PSC's minutes, in an underhanded attempt to create a hearsay problem. *See generally United States v. Pirk*, 2018 U.S. Dist. LEXIS 52235, at *6-8 (W.D.N.Y. Mar. 28, 2018) (explaining, in general, business record hearsay exception requirements, and noting "broadest possible interpretation" of "qualified witness" as someone who "understands the system" to lay proper foundation for applying the exception).

        ii.        *Boudreau changes his justification for Plaintiff's termination twice.*

After telling the PSC that Plaintiff's termination was due to the University's budget, Boudreau shifted gears two weeks later when announcing his decision to the University's faculty - - now claiming that he sought a "change in leadership," while making no mention of any performance issues and thanking Plaintiff for her service "for the past several years." Pl.'s Cntr.S., ¶ 141. It was only after Plaintiff filed her charge of discrimination that, for the very first time, Defendants claimed that her performance caused its decision. Pl.'s Cntr.S., ¶¶ 132-139, 143.

Tellingly, however, Defendants' replacement for Plaintiff - - Jennifer Light - - emphasized the *exact same points* that Plaintiff repeatedly made when requesting additional resources to help with ongoing investigations in her office, going so far as to say that she "cannot imagine how someone could do the wide array of activities *and* do investigations . . . [as] the Chief Diversity Officer's many responsibilities make thorough investigation difficult," while "stress[ing] that the need for a full-time investigator is great. . . ." Pl.'s Cntr.S., ¶ 118. And rather than discipline or fire Ms. Light from her position, Defendant Boudreau decided to unilaterally *increase* Ms. Light's already existing compensation by $12,000.00. Pl.'s Cntr.S., ¶ 120.

Defendants' arguments - - that Plaintiff cannot "create a fact issue on pretext by pointing to the allegedly deficient qualification of her successors," and that her successors are improper

comparators - - are misguided. Dkt. No. 64, Defs.' Mem., at 21-22. Rather than argue that Plaintiff's successor was "deficient," the critical focus is instead that Boudreau's decision to provide a raise to Ms. Light and to offer more resources to her - - such as hiring an additional investigator, Diana Cuozzo, Pl.'s Cntr.S., ¶ 119 - - directly contradict his *original* budgetary justification for Plaintiff's termination. Pl.'s Cntr.S., ¶ 140. This strongly suggests his unlawful motivation to terminate Plaintiff's employment was his retaliatory animus.

All told, the record amply demonstrates disputed issues of material fact concerning Defendants' true motivation for terminating Plaintiff's employment. Defendants claim it was solely because of her poor performance. But Plaintiff points to overwhelming record evidence that could lead a reasonable juror to conclude that Defendants "would not have [terminated her] in the absence of a retaliatory motive." *Kwan*, 737 F.3d at 846. The Court should therefore deny Defendants' motion, as the competing evidence makes this case "grist for the jury's mill." *Rubin*, 2019 U.S. Dist. LEXIS 155760, 2019 WL 4366545, at *7 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### C.    Ample Record Evidence Supports Plaintiff's Theory that Her Advocacy on Behalf of Curtis Rias Led Defendants to Retaliate.

Defendants next falsely argue that "there is no evidence that Plaintiff even <u>engaged</u> in any disability-related 'advocacy' for Rias during her conversation with President Boudreau," misrepresenting the record and claiming that Plaintiff "only worked on Curtis Rias's request for a disability accommodation at the appeal level," and that Plaintiff "could not remember" anything relating to Defendant Boudreau on this matter. Dkt. No. 65, Defs.' Mem., at 23 (emphasis in original). Rather, the record evidence clearly connects Plaintiff's advocacy on behalf of Curtis Rias - - both *before* CUNY's Human Resources denied his original disability accommodation

request, and *after* Plaintiff began working on his appeal - - to her final opposition to Defendant Boudreau's and others' desire to overtly retaliated against Mr. Rias just weeks before her firing.

Plaintiff competently disputes Defendants' arguments relating to Curtis Rias. First, while City College's Human Resources Department denied Mr. Rias's request in January 2018, at least as early as October 27, 2017, Plaintiff met with Mr. Rias and exchanged a series of lengthy emails with him, his supervisors, and senior HR manager John Siderakis. Pl.'s Cntr.S., ¶¶ 121-123. Mr. Rias's complaint sent via email to Plaintiff in October 2017 alleged discrimination and retaliation based on his race, disability, and not-yet-filed request for accommodation. Pl.'s Cntr.S., ¶¶ 121-122. After that email, Mr. Rias met with Plaintiff, and expressed to her these concerns, as well as concerns relating to sexual orientation discrimination against him. Pl.'s Cntr.S., ¶ 121-123. Plaintiff then *assisted* Mr. Rias with filing his accommodation request, which was ultimately denied. Pl.'s Cntr.S., ¶ 77.

Defendants' false claim - - that Plaintiff "fabricate[ed]" Boudreau's unlawful threats against Mr. Rias as "wholly devoid of evidentiary support" - - represents a borderline bad faith argument, wholly untethered from the actual record evidence. That is, upon Human Resources denying Mr. Rias's accommodation request, the record plainly demonstrates how Plaintiff vocally advocated against Defendant Boudreau's and others' scheme to retaliate against Mr. Rias in response to Mr. Rias's decision to file an "external" complaint, which led Plaintiff to specifically observe Defendant Boudreau become "outraged." Pl.'s Cntr.S., ¶ 129. Her advocacy on behalf of Mr. Rias, and against retaliation, was **explicit**, and directed to, among other individuals, Defendant Boudreau during a meeting just a few weeks before her termination. Pl.'s Cntr.S., ¶¶ 128-131. She opposed Boudreau's and others' view that Mr. Rias was "a troublemaker" due to filing his external complaint, and expressly stated that choosing to commence performance evaluations against Mr.

Rias - - for the first time in his nearly twenty-year tenure as an employee - - would be viewed as retaliation because the only reason for Boudreau's and others' decision to commence the reviews was "to make [work] difficult for [Mr. Rias]." Pl.'s Cntr.S., ¶¶ 123-131.

Defendants dispute Plaintiff's account only by pointing to Defendant Boudreau's own testimony - - but Boudreau himself admits that he and Plaintiff attended this same meeting. Pl.'s Cntr.S., ¶ 73, 123. Far from amounting to "inadmissible speculation about the attendees' collective mental state" as Defendants suggest, Dkt. No. 64, Defs,' Mem. at 25, Plaintiff specifically notes Boudreau's role in the retaliatory scheme, while competently testifying about her opposition thereto. This is more than enough to satisfy her *prima facie* burden relating to her Curtis Rias theory of retaliation, and the Court should swiftly reject Defendants' argument.

### D. Plaintiff Presents Substantial Evidence of Pretext, Creating Disputed Issues of Material Fact Warranting Denial of Summary Judgment.

Repeating their same argument relating to Lynda Dodd, Defendants again claim that Plaintiff cannot show that Defendants' decision to terminate her was pretext, arguing that there is "no competent evidence" to support Plaintiff's theories. But as set forth above in ample detail, the examples Defendants cite - - understaffing Plaintiff's department; cutting the hours of Plaintiff's investigator; and reducing Defendants' interactions with Plaintiff - - are all supported by competent evidence that strongly indicate a retaliatory animus behind Defendants' decisions to do each of these things. It is also well-established Second Circuit law that "a plaintiff may rely on evidence comprising her *prima facie* case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan*, 737 F.3d at 847 (collecting cases). Here, Plaintiff does just that and more:

- Defendant terminated Plaintiff mere weeks after her opposition to retaliation against Curtis Rias "outraged" Defendant Boudreau, Pl.'s Cntr.S., ¶ 129;

- Defendant cut his meetings with Plaintiff against his own practices and against formal University policy, only to reinstitute them after her termination to benefit her successor, Pl.'s Cntr.S., ¶¶ 104, 110-111, 136-139; and

- Defendant never gave Plaintiff any performance evaluations or indeed any feedback at all on any alleged "performance issues," Pl.'s Cntr.S., ¶¶ 132-137, 143-147;

- Defendants provided three separate justifications for their decision to terminate Plaintiff, Pl.'s Cntr.S., ¶¶ 140-147; and

- Defendant offered more resources to Plaintiff's department after her termination, directly contradicting their *first* reason for her termination, Pl.'s Cntr.S., ¶¶ 116-120, 142.

These facts all point to "inconsistent employer explanations" for Boudreau's conduct and for his decision to terminate Plaintiff's employment. This is more than enough for Plaintiff to demonstrate disputed issues of material fact remain for a jury to decide. And viewing those facts in the light most favorable to Plaintiff, a jury could readily find that were it not for Plaintiff's advocacy - - whether on behalf of Lynda Dodd or on behalf of Curtis Rias - - Defendants would **not** have fired Plaintiff when they did. The Court should therefore deny Defendants' motion.

## II.    DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S SECTION 1981 CLAIM.

Defendants' argument against Plaintiff's Section 1981 claim is a mere restatement of their argument against Plaintiff's Curtis-Rias-based Rehabilitation Act claim, simply recasting the same positions and claiming that there is "no evidence" of Plaintiff complaining to Defendant Boudreau, or of Defendant Boudreau's reaction thereto. *See generally*, Dkt. No. 64, Defs.' Mem., at 28-30. But as described in detail above, Plaintiff in fact did advocate on behalf of Curtis Rias directly to Defendant Boudreau and others, opposing their efforts to retaliate against Mr. Rias after he filed his external complaint with the EEOC. *See generally* Sections I.C-D, *supra*.

There is no dispute that Mr. Rias's complaint involved claims of race discrimination - - and Plaintiff points to competent evidence in the record displaying his race-based complaints to her, before Defendants denied his initial accommodation request, and before Defendants planned on retaliating against him for standing up for his rights. Pl.'s Cntr.S., ¶¶ 123-131. Accordingly, Plaintiff satisfies her *prima facie* burden by demonstrating that her termination was followed closely in time to her opposition to Defendant Boudreau's and others' scheme to retaliate against Mr. Rias, at least in part due to his race-based complaints. And, her *prima facie* evidence coupled with her evidence that Defendants' true motivation for her termination was indeed their retaliatory animus, satisfies her burden to present disputed issues of material fact that could lead a reasonable jury to conclude Defendants' proffered legitimate reason for its decision was mere pretext. Defendants attempt to cast Defendant Boudreau's systematic undermining of Plaintiff and her office; his inconsistent behavior before and after terminating Plaintiff's employment; and his shifting justifications for his decision - - all as mere "workplace slights." Dkt. No. 64, Defs.' Mem., at 29-30. But these are not isolated incidents. They instead demonstrate Defendant Boudreau's retaliatory animus to paint Plaintiff as a poor performer *after the fact* of her termination in a thinly-veiled effort to enact revenge against Plaintiff for repeatedly opposing Boudreau's discriminatory and retaliatory personnel decisions. And it is well-settled that a combination of isolated incidents may form the basis of a retaliation claim "once they reach a critical mass." *See Rolon v. Ward*, 345 F. App'x 608, 612 (2d Cir. 2009) (citing *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)) (describing "critical mass" theory in context of First Amendment retaliation claim). While each of Plaintiff's adverse actions standing alone would satisfy her burden, she even more easily defeats Defendants' motion when they are viewed together as a critical mass of retaliatory events.

For the same reasons, then, that the Court should reject Defendants' motion on Plaintiff's Rehabilitation Act claim, so too should the Court deny Defendants' motion on Plaintiff's retaliation claim under Section 1981.

## III.    PLAINTIFF'S NEW YORK CITY HUMAN RIGHTS LAW CLAIMS EVEN MORE EASILY WITHSTAND SUMMARY JUDGMENT.

Defendants concede Plaintiff has established her *prima facie* case on her NYCHRL retaliation claim, acknowledging that "Plaintiff's termination" meets the "more lenient" standard under the City Law. Dkt. No. 64, Defs.' Mem., at 31. Defendants also concede that Plaintiff need not prove that Defendants' retaliatory intent was the but-for cause of her termination, *id*. at 31-32, because Plaintiff need only show that retaliation played "any part" in Defendants' adverse actions. *Uttarwar v. Lazard Asset Mgmt. LLC*, 2024 U.S. Dist. LEXIS 51499, at *38-39 (S.D.N.Y. Mar. 22, 2024) (citing *Baker v. MTA Bus. Co.*, 2023 U.S. Dist. LEXIS 133710, 2023 WL 4896686, at *17 (S.D.N.Y. Aug. 1, 2023)). Moreover, under the NYCHRL, the definition of an "adverse action" is broader than federal retaliation statutes, requiring only a showing the "action that would be reasonably likely to deter a person from engaging in a protected activity." *Ndongo v. Bank of China Ltd.*, 2023 U.S. Dist. LEXIS 31238, at *18 (S.D.N.Y. Feb. 24, 2023) (citing *Scott-Robinson v. City of New York*, 2016 U.S. Dist. LEXIS 177789, 2016 WL 7378775, at *4 (S.D.N.Y. Dec. 15, 2016)).

Here, there is no doubt that Defendants' deviation from Boudreau's normal policy and the University's practices with respect to Plaintiff's job serve as competent evidence of pretext, as Boudreau immediately reinstituted his and the University's policies and practices in favor of Plaintiff's successor. Based on the NYCHRL's far more "lenient" retaliation standard than its federal analogues, Plaintiff easily meets her *prima facie* burden and rebuts Defendants' proffered

justifications for her termination, demonstrating that a jury could find those shifting justifications to be pretext.

As described at length above, the "inconsistencies in the various explanations offered" by Defendants, as well as evidence that Boudreau became "outraged" in response to Plaintiff's objection to retaliating against Mr. Rias, "combined with the temporal proximity between [her] complaints" and Plaintiff's termination, create a "material dispute as to whether [Defendants'] actions were merely a pretext for impermissible retaliation under NYCHRL's more liberal causation standard." *Joseph v. Owens & Minor Distrib.*, 5 F. Supp. 3d 295, 322 (E.D.N.Y. 2014) (citing *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 181 (S.D.N.Y. 2011)). The Court should therefore deny this branch of Defendants' motion, and permit Plaintiff's NYCHRL claim to advance to trial.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

Dated: New York, New York
      August 2, 2024

                                 Respectfully submitted,

                                 JOSEPH & NORINSBERG, LLC

By:                         

                                 JON L. NORINSBERG, ESQ.
                                 MICHAEL R. MINKOFF, ESQ.
                                 *Counsel for Plaintiff*